UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------X
NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED
PEOPLE,

                 Plaintiff,

       - against -

A.A. ARMS, INC., et al.,

                 Defendants.
------------------------------------------------X

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT, E.D.N.Y.

★ MAR 1 0 2003 ★

BROOKLYN OFFICE

**O R D E R**

99 CV 3999 (JBW)
99 CV 7037 (JBW)

On February 13, 2003, plaintiff moved for an order: 1) reopening discovery and authorizing certain limited fact discovery based upon the February 3, 2003 Declaration of Robert Ricker, Esq., filed in the Superior Court of California, San Diego County, in connection with the action, People v. Arcadia Machine & Tool; and 2) disqualifying three attorneys, James Dorr, Esq., Timothy Bumann, Esq., and Georgia Nichols, Esq.,[1] from acting as trial counsel in this action. Plaintiff asserts that Mr. Ricker's Declaration details "concerted action on the part of defendants to prevent the implementation of safety regulations and voluntary measures to exercise control over the distribution and sale of firearms," information that plaintiff claims "has been suppressed by defendants in this action." (Pl's. Mot. at 1-2).


A.   The Ricker Declaration

      Specifically, Mr. Ricker, former Director of Government Affairs, and later, Executive

---

[1]Based upon the representations of counsel, Ms. Nichols is not acting as "trial counsel" in this instant action. Therefore, the motion as to her disqualification is moot.

Director of the American Shooting Sports Council ("ASSC"), which he described as "the leading

organization representing the interests of the gun industry in legislative and policy-making

forum," details in his declaration his lengthy career as counsel, working in the firearms industry

beginning in 1981 until his resignation from the ASSC in July 1999.  (Ricker Aff. ¶¶ 1-5).  Based

on his "regular personal contact" with gun manufacturers and distributors, including "daily

telephone conversations with gun industry executives," and visits to the facilities of certain

manufacturers and distributors, his attendance at ASSC Board of Directors meetings, meetings

between industry members and the Bureau of Alcohol Tobacco and Firearms ("ATF"), industry

"Planning Meetings," and the annual industry trade meetings known as the "SHOT Show," Mr.

Ricker gained extensive knowledge of the inner workings of the firearms industry and will testify

about discussions among industry leaders and their agents regarding the problems of illegal gun

sales and efforts to deal with the problem.  (Id. ¶¶ 6-8, 11, 16).

Among other things, Mr. Ricker states in his declaration that "[t]he firearms industry . . .

has long known that the diversion of firearms from legal channels of commerce to the legal black

market . . . occurs principally at the distributor/dealer level," passing from "licensed dealers to

juveniles and criminals through such avenues as straw sales, large-volume sales to gun traffickers

and various other channels by corrupt dealers or distributors."  (Id. ¶ 8).  He further asserts that

leaders in the industry have "long known" that it is possible for the industry to take steps to

prevent these illegal transactions, but they "have consistently resisted taking constructive

voluntary action to prevent firearms from ending up in the illegal gun market and have sought to

silence others within the industry who have advocated reform."  (Id.)  Among the potential steps

that could be taken but that have been consistently rejected by the industry are adequate training

2

and enforcement of responsible business practices of gun dealers, improved monitoring of multiple sales of firearms, and efforts to force dealers to comply with federal provisions requiring the reporting of such multiple sales. (Id. ¶¶ 9-10).

In his declaration, Mr. Ricker described several meetings attended by various high-level members of the industry where these issues were discussed, including a 1994 Planning Meeting held in Atlanta at which the issue of corrupt dealers and gun shows as "'black market outlets to the criminal trade'" were discussed and at which Bill Bridgewater, the Director of the National Alliance of Stocking Gun Dealers ("NASGD"), urged industry members to voluntarily take steps to deal with these issues. (Id. ¶ 11). According to Mr. Ricker, these calls for voluntary action were rejected by "many manufacturers and distributions" who "hide behind the fiction that as long as a retail dealer has a valid federal firearms license to sell guns, no attention to the dealers' business practices is required by its suppliers." (Id. ¶ 12). Moreover, as a consequence of his position on this issue and others, Bill Bridgewater was forced to give up his seat on the ASSC Board. (Id. ¶ 12).

Mr. Ricker also indicates in his declaration that "[d]espite claims to the contrary, most gun manufacturers . . . have been aware that ATF will provide manufacturers with tracing information" about that manufacturer's guns and that "if a particular dealer shows up in a firearm trace "'three or four' times per year," that is an important indicator that this particular dealer may be involved in gun trafficking. (Id. ¶ 14). Indeed, Georgia Nichols, one of the attorneys sought to be deposed by plaintiff, was present during a visit to the ATF tracing center, and at her request, was given a computer printout of ATF traces in connection with O.F. Mossberg & Sons, her employer at the time. (Id. ¶ 14).

3

Mr. Ricker also describes certain "lawyers meetings" that occurred during the period 1992 through 1997 at various SHOT Shows, which were attended by both inside and outside counsel for the firearms industry, where they discussed "various legal, legislative and policy issues facing the industry." (Id. ¶ 16).  Among others specifically named as in attendance at the first series of these meetings was Georgia Nichols, James Dorr and Timothy Bumann, each of whom is currently counsel to various defendants in the NAACP action currently pending before this Court. (Id.)  The Ricker Declaration states as follows:

> The "lawyers meetings" often addressed questions such as whether the industry should take voluntary action to better control the distribution of guns. Although it was known that Richard Feldman and I advocated a more proactive approach as a means of heading off legislative action and reducing the risk of future liability, . . . Ms. Nichols, Mr. Dorr, Mr. Bumann and others consistently opposed that idea. The prevailing view was that if the industry took action voluntarily it would be an admission of responsibility for the problem.

(Id.)  According to Mr. Ricker, Mr. Dorr and Ms. Nichols became concerned that industry counsel were discussing these topics and Mr. Dorr allegedly told Mr. Ricker after one meeting that "he thought the meetings were 'dangerous.'" (Id.)  Following the 1996 meeting, Mr. Ricker was told by Ms. Nichols that "Jim Dorr had 'put out the word' that industry lawyers should not attend future meetings, "effectively putting an end to the meetings." (Id.)

Mr. Ricker's Declaration further details constructive steps taken by the industry as a consequence of efforts made by him and by Richard Feldman, ASSC Executive Director, including the implementation of a child-safety lock program.  (Id. ¶ 18).  According to Mr.

4

Ricker, however, after the announcement of that program, Robert Delfay, President of SAAMI,[2] and others closely allied with the National Rifle Association ("NRA") took steps "to prevent anything like the safety lock agreement from ever happening again." (Id. ¶ 19). The declaration details various actions and statements made by Mr. Delfay and others from the NRA which, according to Mr. Ricker, ultimately resulted in a decision to withdraw funding to ASSC legislative and government affairs activities, the resignation of several major manufacturers and distributors from the ASSC, and the consequential merger of the ASSC into the NSSF under Mr. Delfay's leadership. (Id. ¶ 21). Following that, Mr. Ricker resigned from the ASSC, asserting that "[b]oth Mr. Feldman and I were silenced as voices for reform . . . and the NRA was firmly in charge of the industry's legislative and policy making arm." (Id.)

B.  Plaintiff's Motion to Reopen Discovery

Turning first to plaintiff's motion to reopen fact discovery, plaintiff details a number of areas that need to be explored in light of the revelations made in Mr. Ricker's Declaration, including: 1) the claim that the gun manufacturers and distributors "are disparate members" who "conduct their businesses differently;" 2) the extent of their knowledge regarding their distribution partners' practices of sending guns into crime; and 3) their failure to act not because as they claim, they believed nothing could be done, but because of concerns regarding liability. (Pl's. Mot. at 3-4). Plaintiff contends that this evidence is probative and necessary to establish plaintiff's claim of concerted action sufficient to confer joint and several liability upon industry members, a showing which is relevant both to issues of jurisdiction and responsibility for

---

[2]SAAMI stands for Sporting Arms and Ammunition Manufacturer's Institute.

abatement under plaintiff's public nuisance theory. (See Pl's. Mot. at 5) (citing Hall v. E.I.
DuPont, 345 F. Supp. 353 (E.D.N.Y. 1972); Falise v. Am. Tobacco Co., 94 F. Supp. 2d 316
(E.D.N.Y. 2000); City of New York v. Lead Industries Ass'n., 190 A.D.2d 173, 597 N.Y.S.2d
698 (1st Dep't 1993).

     In seeking additional discovery, plaintiff's counsel lists nine depositions that she wishes
to take: 1) Mr. Dorr, 2) Mr. Bumann, 3) Ms. Nichols, 4) Mr. Delfay, 5) Michael Saporito,
General Counsel of RSR Wholesale Guns and Chairman of the Board of ASSC, who, among
other things, allegedly attended the 1994 meeting in Atlanta, as well as participating in the 1996
discussions with ATF described by Mr. Ricker (Ricker Aff. ¶¶ 11-12, 14); 6) Robert Chiarello of
Joseph Chiarello & Co., who is a representative from the insurance company that provides
insurance to various of the defendants, and who allegedly attended the SHOT Show meetings
described by Mr. Ricker (id. ¶ 16), along with 7) Stephen Halbrook, 8) Richard Gardiner, and 9)
Don Kates, lawyers for the NRA and Citizens Committee for the Right To Keep and Bear Arms,
who were allegedly also at the SHOT Show meetings, and 10) Paul F. Januzzo, Chief Operating
Officer and General Counsel of Glock, Inc. and a former officer with the ASSC, who allegedly
attended the SAAMI meeting in November 1997 where Ricker and Feldman were denounced by
others for their support of the safety lock reform. (Id. ¶ 19). Plaintiff indicates that with respect
to trial counsel in this case, Messrs. Dorr and Bumann, it is important to explore in what capacity
each of them attended these lawyers meetings to determine if, as they claim, these were only
"networking" meetings or if, as plaintiff believes, they were there in a representative capacity

6

gathering information and discussing strategies regarding overall industry policies and practices.[3]

Plaintiff contends that this information will further demonstrate and explain the reason for what

plaintiff's marketing expert, Dr. Gundlach, has described as "'shockingly parallel'" behavior in

terms of marketing and distribution practices among these various defendants.

In opposing plaintiff's request to reopen discovery, defendants argue that the areas of

discovery which plaintiff seeks to explore were the subject of discovery in the prior Hamilton v.

AccuTek litigation and could have been explored by plaintiff in the current case prior to the close

of discovery in August 2002. (See Letter of James P. Dorr, dated Feb. 10, 2003 (noting that the

court in Hamilton permitted discovery into the "mechanisms in place for joint activity on matters

of mutual interest . . . including industry wide efforts to thwart legislation or regulation with

regard to the distribution of handguns")). Defendants contend that Mr. Ricker's disaffection with

the gun industry has been well-known for years and was in fact the subject of an article in

Newsweek in 1999. Accordingly, they argue that plaintiff should not only have been aware of

Mr. Ricker's revelations, but should have used the opportunity to question witnesses such as Mr.

Sanetti, regarding these topics when they were deposed earlier in the case.

Defendants also question whether the testimony that is being sought from the individuals

who attended the lawyers meetings is relevant at all given the court's rejection of a theory of

enterprise liability advanced in Hamilton. See Hamilton v. AccuTek, 935 F. Supp. 1307, 1331

(E.D.N.Y. 1996). With respect to the theories of joint and concerted action or conscious parallel

activity urged by plaintiff as a justification for pursuing this discovery, defendants argue that

---

[3]Plaintiff also seeks the time records, notes and memoranda prepared by these attorneys
for their clients, but she did not specify at the hearing a time limit or subject matter limit in this
regard. (Transcript of Feb. 21, 2003 hearing before this Court at 9).

nothing in the single paragraph in Mr. Ricker's Declaration relating to the lawyers' discussions of policies at SHOT Shows even "comes close" to establishing a basis for finding joint and concerted action or for reopening discovery.

Having reviewed the Ricker Declaration, the prior depositions of certain witnesses in the case,[4] and considered the arguments of the parties, this Court finds that plaintiff has established sufficient grounds to reopen fact discovery on a limited basis. To the extent that defendants contend that plaintiff should have been aware of Mr. Ricker's position earlier and previously had ample opportunity to question deponents in this case regarding the meetings and discussions addressed in his Declaration, this Court credits plaintiff's counsel's representation that despite taking numerous depositions in this case and in <u>Hamilton</u>, she was never informed about these discussions nor was she aware until the filing of the Ricker Declaration in California of the nature of his testimony in this regard. Indeed, despite defendants' claims that Mr. Ricker's views were well-known in the industry, the fact that the filing of his declaration was the subject of major press attention only two weeks ago suggests that at least some of the information imparted in his statement was not "well-known."

Moreover, while defendants contend that plaintiff has had a sufficient opportunity to question witnesses previously about these topics and chose not to, plaintiff's counsel's statement that she has been "stymied" from the beginning in her efforts to uncover this information is borne out by a review of the discovery responses received from defendants as well as the prior testimony of witnesses in this regard. Neither Mr. Delfay or Mr. Squire was questioned about the

---

[4]Late Friday evening, counsel for defendants provided the Court with copies of the transcripts of the depositions of Robert Delfay, Patrick M. Squire, and Richard Feldman. <u>See</u> Letter of Mitchell Rait, dated Feb. 21, 2003).

meetings discussed in Ricker's Declaration and although Mr. Delfay was questioned about certain meetings in 1994[5] that plaintiff was aware of at that time, his response to many of her questions was that he did not recall the specifics of what was discussed. (See Delfay Deposition, Nov. 28, 1995 at 89-91, 93, 145 -146). Moreover, Mr. Delfay was deposed in 1995 and many of the issues raised and meetings addressed in the Ricker Declaration postdate that period.

Accordingly, this Court finds that plaintiff should be permitted now to depose certain individuals named in Mr. Ricker's Declaration regarding their knowledge of these issues and to confront others who were previously deposed and who were not questioned about these meetings. For example, among the witnesses sought by plaintiff who was previously deposed, is Paul F. Jannuzzo. Defendants object to his deposition because he was deposed in this case and in Hamilton and because he is only mentioned in one paragraph of Mr. Ricker's Declaration where he is mentioned as having allegedly attended a wholesale show where Ricker and Feldman were denounced by others. (Ricker Decl. ¶ 19). In the absence of any prior knowledge about this meeting, counsel can hardly have been expected to have questioned Mr. Jannuzzo about that meeting prior to the release of Mr. Ricker's declaration.

Moreover, this Court finds that regardless of the ultimate determination by the trial court as to the admissibility of evidence relating to meetings held to discuss strategies and policies within the industry, the depositions of certain of these individuals could lead to the discovery of admissible evidence. Because this Court finds the information in the Ricker Declaration to be highly relevant and not previously disclosed, this Court finds a basis to reopen discovery.

---

[5]Although unclear, it does not appear that these meetings are the same as the ones addressed in Mr. Ricker's Declaration.

However, with respect to plaintiff's request to depose Mr. Bumann and Mr. Dorr regarding their role at the SHOT Show meetings of counsel, plaintiff has not at this time established the grounds necessary to warrant either a deposition of trial counsel or, as discussed below, their disqualification.  First, unlike the other meetings described by Mr. Ricker in some detail, it is not clear from the single paragraph in the Ricker Declaration as to what specific topics were addressed at these attorneys' meetings or what their relevance is to the plaintiff's claim of concerted action.  The Declaration simply states that the "'lawyers meetings' often addressed questions such as whether the industry should take voluntary action to better control the distribution of guns," with various individuals taking different positions on these subjects. More important, however, is that given the vague description in Mr. Ricker's Declaration and the fact that others can testify to what occurred, the drastic recourse to a deposition of trial counsel at this point, without more, particularly given the upcoming trial date, is not warranted.

Accordingly, this Court hereby authorizes plaintiff to serve subpoenas on those individuals who are named in Mr. Ricker's Declaration as having attended the meetings where strategy was discussed, including Ms. Nichols, Mr. Delfay, Mr. Saporito, Mr. Chiarello, Mr. Halbrook, Mr. Gardiner, Mr. Kates and Mr. Januzzo.  Certain individuals, including Mr. Delfay, Mr. Saporito, Mr. Chiarello, Mr. Halbrook, Mr. Gardiner, and Mr. Kates, whose views were not represented by counsel either at the argument or in post argument submissions, may move to quash any subpoenas in accordance with Rule 45 of Federal Rules of Civil Procedure.  However, such motions are Ordered to be filed on an expedited schedule within 1 week of receiving service of the subpoena.  This Court denies plaintiff's request to depose Mr. Dorr and Mr. Bumann at this time.

10

C. Disqualification

      Plaintiff has also moved to disqualify Mr. Dorr and Mr. Bumann from acting as trial counsel based on their alleged roles at these meetings.

### 1. Standards

      It is well-established that courts in this circuit approach motions for disqualification with "cautious scrutiny," mindful of the court's responsibility to preserve a balance, "delicate though it may be, between an individual's right to his own freely chosen counsel and the need to maintain the highest ethical standards of professional responsibility." Emle Indus., Inc. v. Patentex, Inc., 478 F.2d 562, 565 (2d Cir. 1973); see also Gleason v. Zocco, 941 F. Supp. 32, 35 (S.D.N.Y. 1996) (noting that courts must carefully balance competing considerations in deciding motions to disqualify). In addition, courts are conscious of the concern that a motion for disqualification may be made for tactical reasons only. See Vegetable Kingdom, Inc. v. Katzen, 653 F. Supp. 917, 921 (N.D.N.Y. 1987) (citations omitted); see also Red Ball Interior Demolition Corp. v. Palmadessa, 908 F. Supp. 1226, 1239 (S.D.N.Y. 1995) (noting that motions for disqualification can often be made for tactical reasons and, thus, are disfavored). Therefore, the burden of establishing the need for disqualification is on the moving party, and a high standard of proof must be met before the motion will be granted. See Ives v. Guilford Mills, Inc., 3 F. Supp. 2d 191, 202 (N.D.N.Y. 1998) (citations omitted); see also Kubin v. Miller, 801 F. Supp. 1101, 1113 (S.D.N.Y. 1992) (requiring a high standard of proof "in order to protect a client's right to freely choose counsel") (citing Gov't of India v. Cook Industries, Inc., 569 F.2d 737, 739 (2d Cir. 1978)).

In arguing that Mr. Bumann and Mr. Dorr should be disqualified, plaintiff contends that they ought to be called as witnesses in this case given their participation in these SHOT Show meetings.  Under the New York Code of Professional Responsibility, as adopted and amended on June 30, 1999, if "a lawyer learns or it is obvious that the lawyer ought to be called as a witness on a significant issue on behalf of the client, the lawyer shall not serve as an advocate on issues of fact before the tribunal." 22 N.Y.C.R.R. § 1200.21 (formerly D.R. 5-102(A)).  Similarly, where "a lawyer learns or it is obvious that the lawyer . . . may be called as a witness on a significant issue other than on behalf of the client, the lawyer may continue the representation until it is apparent that the testimony is or may be prejudicial to the client at which point the lawyer . . . must withdraw from acting as an advocate before the tribunal." Id. D.R. 5-102(d) (formerly D.R. 5-102(B)).[6]

This disciplinary rule was developed out of a strong concern that calling a party's lawyer

---

[6]The prior version of subsection (c) reads as follows:

> (A) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that the lawyer ought to be called as a witness on behalf of the client, the lawyer shall withdraw as an advocate before the tribunal, except that the lawyer may continue as an advocate and may testify in the circumstances enumerated in section 1200.20(b)(1) through (4) of this Part.

N.Y. Judiciary, Appendix, D.R. 5-102(A) (McKinney 1992).

Thus, D.R. 5-102(c) revised D.R. 5-102(A) by adding the requirement that the lawyer must be a witness "on a significant issue" and qualifying the "as an advocate" language with the phrase "on issues of fact."  The word "withdraw" has also been changed to "not serve."  Disciplinary Rule 5-102(d) revised D.R. 5-102(B) by also adding that the lawyer must be a witness "on a significant issue."

as a witness in a case would "undermine[ ] the integrity of the judicial process." See MacArthur

v. Bank of New York, 524 F. Supp. 1205, 1208 (S.D.N.Y. 1981).  Moreover, the rule is designed

to protect the adverse party, as the "jury may view an attorney as possessing special knowledge

of a case and therefore accord a testifying attorney's arguments undue weight." Id.; but see

Fulfree v. Manchester, 945 F. Supp. 768, 770 (S.D.N.Y. 1996) (stating that the advocate and

witness roles are inconsistent because "the public might think that the lawyer is distorting the

truth for the sake of the client") (citing Munk v. Goldome Nat'l Corp., 697 F. Supp. 784, 788

(S.D.N.Y. 1988)).

The Second Circuit has interpreted D.R. 5-102(c)[7] as follows:  "[t]he test under

subdivision [(c)] is whether the attorney's testimony could be significantly useful to his client.  If

so, he should be disqualified regardless of whether he will actually be called." Lamborn v.

Dittmer, 873 F.2d 522, 531 (2d Cir. 1989); accord Ragdoll Prod. Ltd. v. Wal-Mart Stores, Inc.,

No. 99 CV 2101, 1999 WL 760209, at *2 (S.D.N.Y. Sept. 27, 1999).

Similarly, the Second Circuit has interpreted D.R. 5-102(d) to "come[ ] into play where a

lawyer's testimony would contradict or undermine his client's factual assertions." Lamborn v.

Dittmer, 873 F.2d at 531; accord Ragdoll Prod. Ltd. v. Wal-Mart Stores, Inc., 1999 WL 760209

at *2.  The intention to call an adverse party's attorney as a witness, without more, is insufficient

grounds to disqualify the attorney.  "The party bringing the motion under subsection (d) carries

the burden to show both the necessity of the testimony and the substantial likelihood of

---

[7]The case law interpretations of these provisions addressed the prior version of D.R. 5-
102.

prejudice." Ragdoll Prod. Ltd. v. Wal-Mart Stores, Inc., 1999 WL 760209 at *2 (citing Nat'l

Union Fire Ins. Co. v. L.E. Myers Co. Group, 937 F. Supp. 276, 281 (S.D.N.Y. 1996); Stratavest

Ltd. v. Rogers, 903 F. Supp. 663, 667 (S.D.N.Y.1995)).

     In determining the necessity of the testimony, the following factors have been considered:

the significance of the matters, the weight of the testimony, and the availability of other evidence.

See Stratavest Ltd. v. Rogers, 903 F. Supp. at 667. "Testimony may be relevant and even highly

useful but still not strictly necessary. In cases where the lawyer's testimony is highly relevant and

solely within [his] possession, it is apparent that [he] must be disqualified." Id. (citations

omitted). Courts also examine the degree to which the attorney has been involved in the

underlying transaction when evaluating the necessity of the attorney's testimony. See Gleason v.

Zocco, 941 F. Supp. at 35 (finding attorney was a "necessary witness" based on his "extensive

personal involvement in every aspect of the underlying controversies"); see also Hempstead

Bank v. Reliance Mortg. Corp., 81 A.D.2d 906, 439 N.Y.S.2d 202, 203 (2d Dep't 1981) (finding

that plaintiff had no choice but to call plaintiff's attorney as a witness where the attorney had

"specific and personal knowledge" of the circumstances surrounding the creation of a promissory

note); MacArthur v. Bank of New York, 524 F. Supp. at 1211 (warning that an attorney who

chooses to become "intimately involved in [a] client's business," thus acquiring information that

makes his testimony necessary, must be prepared for removal once the matter reaches litigation).

     Although plaintiff argues that if Mr. Bumann and Mr. Dorr are allowed to continue as

trial counsel, there will be a violation D.R. 5-102(c), there has been no explanation as to why

their testimony could be "significantly useful" to their clients. At most, they attended meetings at

which others, including Mr. Ricker, were present and these other participants obviously can

14

testify about their recollection of these meetings. The trier of fact will then have to draw conclusions based on an evaluation of the witnesses' respective credibility. As the court in Kubin v. Miller noted, "an attorney whose testimony would merely corroborate the testimony of others may not be subject to disqualification." 801 F. Supp. at 1113 (citing MacArthur v. Bank of New York, 524 F. Supp. at 1209).

Given that there are witnesses who can be presented with respect to the meetings attended by these attorneys and given that it is unclear at this time what relevance these attorneys meetings may have to the case, this Court finds that plaintiff has failed to carry its burden of showing at this time that Mr. Bumann's and Mr. Dorr's testimony could be "significantly useful" to their respective clients or "necessary" to this case. As the court in Kempner v. Oppenheimer & Co., Inc. noted: "the rule [D.R. 5-102] is simply not implicated where 'plaintiffs' prima facie case [or, presumably defendant's rebuttal] can readily be presented through documents and the testimony of other witnesses who have first hand knowledge of the facts.'" 662 F. Supp. 1271, 1279 (S.D.N.Y. 1987) (quoting Ross v. Great Atlantic & Pacific Tea Co., Inc., 447 F. Supp. 406, 408 (S.D.N.Y. 1978)).

Plaintiff contends that regardless of whether Messrs. Bumann and Dorr "ought" to be called as witness, their very presence as counsel in the case makes them "unsworn witnesses," requiring their disqualification. See, e.g., United States v. Locascio, 6 F.3d 924, 933 (2d Cir. 1993) (upholding the disqualification of counsel based on his presence during certain tape-recorded conversations to be used by the government against his client); United States v. Orgad, 132 F. Supp. 2d 107, 124 (E.D.N.Y. 2001). As the Second Circuit has noted in Locascio, "[a]n attorney acts as an unsworn witness when his relationship to his client results in his having first-

15

hand knowledge of the events presented at trial," which allows him "to subtly impart to the jury his first-hand knowledge of the events without having to swear an oath or be subject to cross-examination." United States v. Locascio, 6 F.3d at 933.  Arguably, in this case "[i]f counsel were to cross-examine a witness [such as Mr. Ricker] as to [his] conversation with [counsel], argue the credibility of [his] testimony or suggest alternative interpretations of [his] account of the conversation, [counsel] would place himself in the position of an unsworn witness," United States v. McKeon, 738 F.2d 26, 35 (2d Cir. 1984) (citation omitted), and ultimately impair the fact-finding process. United States v. Orgad, 132 F. Supp. 2d at 124.

Counsel's contention that Mr. Dorr and Mr. Bumann are only two attorneys in the case and that they will not be cross-examining Mr. Ricker should he be permitted to testify, does not resolve the issue.  Depending upon the nature of the discussions at the meetings described by Mr. Ricker with Mr. Dorr and Mr. Bumann, it may be that the testimony about their respective roles is not only relevant but becomes central to the case, at which time disqualification may be unavoidable.  However, given the lack of detail regarding the issues addressed at these lawyers' meetings and their relationship to actions or positions taken by the defendants themselves, this Court is not in a position at this time to rule on whether disqualification of Messrs. Dorr and Bumann is required because of their potential role as "unsworn witnesses."

This Court notes that one of the exceptions to DR5-102 arises when the disqualification of an attorney "would work a substantial hardship on the client because of the distinctive value of the lawyer or counsel in the particular case." DR5-102(A)(4).  See United States v. Orgad, 132 F. Supp. 2d at 123.  Both Mr. Dorr and Mr. Bumann have participated in this case from its inception and acted as counsel for certain of their clients in Hamilton.  Recognizing their

16

expertise and knowledge regarding this matter and the hardship that would result to their clients if disqualification were ordered at this time when trial looms shortly, this Court declines to order their disqualification in the absence of a further showing that the meetings at issue are relevant and material to plaintiff's case.

However, if after conducting the deposition of others who attended these meetings, plaintiff can make a further showing as to why disqualification is warranted, counsel is free to refile the motion at that time.  For now, this Court finds the motion to be premature.

## CONCLUSION

Accordingly, It Is Hereby Ordered that plaintiff will be permitted to reopen discovery within the very limited confines of Mr. Ricker's Declaration, and only as to the witnesses listed on page 10 supra.  It Is Further Ordered that plaintiff's motion for disqualification be denied at this time.

**SO ORDERED.**

Dated:  Brooklyn, New York
        February 2, 2003

        _____
        CHERYL L. POLLAK
        U.S. MAGISTRATE JUDGE