Page 1

```
 1
 2                UNITED STATES DISTRICT COURT
 3                EASTERN DISTRICT OF NEW YORK
 4
 5   - - - - - - - - - - - - - - X
 6   NATIONAL ASSOC., et al    :  CV 99-7037
 7                             :  United States Courthouse
 8            Plaintiffs,      :  Brooklyn, New York
 9                             :
10         v.                  :  February 21, 2003
                               :  9:30 a.m.
11   ACUSPORT CORPORATION,
     et al.,
12                            :
            Defendants.       :
13   - - - - - - - - - - - - - X
     NATIONAL ASSOC et al.,    :  CV 99-3999
14
            Plaintiffs,  :
15
         v.             :
16
     AMERICAN ARMS, et al.    :
17
            Defendants. :
18   - - - - - - - - - - - - - X
19
20             TRANSCRIPT OF CONFERENCE
         BEFORE THE HONORABLE CHERYL L. POLLAK
21         UNITED STATES MAGISTRATE JUDGE
22
23   APPEARANCES:
24   For the Plaintiffs:    ELISA BARNES, ESQ.
                            MONICA CONNELL, ESQ.
25                          111 Broadway
                            New York, New York 10006
```

Page 2

```
 1   For the Defendants:
     Various Distributors:  SAIBER, SCHLESINGER
 2                          SATZ & GOLDSTEIN, LLC
                            One Gateway Center
 3                          13th Floor
                            Newark, N.J. 07102-5311
 4
                            BY: DAVID R. GROSS, ESQ.
 5
 6   Glock, et al:     RENZULLI PISCIOTTI & RENZULLI LLP
 7                     300 East 42nd Street
                       New York, New York 10017-5947
 8
                       BY: JOHN F. RENZULLI, ESQ.
 9
10   Sturm, Ruger & Co.:   WILDMAN, HARROLD, ALLEN
11                         & DIXON, ESQS.
                           225 West Wacker Drive
                           Chicago, Illinois 60606-1229
12
                           BY: JAMES P. DORR, ESQ.
13
14   DORR & KIMBALL:    GIBSON, DUNN & CRUTCHER LLP
15                      200 Park Avenue
                        New York, New York 10166-0193
16                      BY: JOHN A. HERFORT, ESQ.
                        WILLIAM A. WARGO, ESQ.
17
18   Colt's Manufacturing   JONES, DAY, REAVIS,
19   Co., Inc.:             & POGUE, ESQS.
                            2727 North Harwood Street
20                          Dallas, Texas 75201-1515
21                          BY: THOMAS FENNELL, ESQ.
                            MICHAEL RICE, ESQ.
22
23   North American Arms:  BECKMAN and ASSOCIATES
24                         Two Penn Center Plaza
                           Philadelphia, Pennsylvania 19102
25                         BY: BRADLEY T. BECKMAN, ESQ.
```

Page 3

```
 1   Appearances (Cont'd.)
     Fabrica D'Armi    GORDON, FEINBLATT, ROTHMAN,
 2   Pietro Beretta:   HOFFBERGER & HOLLANDER LLC
                       233 East Redwood Street
 3                     Baltimore, Md 20202
 4                     BY: LAWRENCE S. GREENWALD, ESQ.
 5
     RILEY's       SAVIANO & TOBIAS
 6   FABER BROS:   9 East 40th Street
                   New York, N.Y. 10016
 7
                   BY: DAVID G. TOBIAS, ESQ.
 8
 9
     CARL WALTHER:    BALBER PICKARD BATTISTONI
10                    MALDONADO & VAN DER TUIN
                      1370 Avenue of the Americas
11                    New York, N.Y. 10019
12                    BY: THOMAS P. BATTISTONI, ESQ.
13
14   JERRY's:     LEAHEY & JOHNSON
15               120 Wall Street
                 New York, N.Y. 10005
16               BY: PETER JAMES JOHNSON, ESQ.
17
     Smith & Wesson:    GREENBERG TRAURIG
18                      885 Third Avenue
                        New York, N.Y. 10022
19
20                      BY: JOEL COHEN, ESQ.
21   CZ-USA       PINO & ASSOCIATES
     Ceska        50 Main Street
22   Cocounsel for Colt's:  White Plains, New York 10606
23               BY: TOM HEALY, ESQ.
24
25
```

Page 4

```
 1   Appearances (Cont.d):
     Smith & Wesson:    SHOOK, HARDY & BACON
 2                      1200 Main Street
 3                      Kansas City, Missouri 64105
 4                      BY: JEFFREY S. NELSON, ESQ.
 5   Bumann:       GREGORY P. JOSEPH, ESQ.
 6                 805 Third Avenue
                   31st Floor
 7                 New York, New York 10022
 8
 9
10
11                      *******
12
13
14
15
16
17
18                 Frederick R. Guerino
                   Official Court Reporter
19                 225 Cadman Plaza E.
                   Brooklyn, New York 11201
20
                   718-260-2448
21
22
23
24
25   Proceedings recorded by mechanical stenography, transcript
```

Page 5

1    Case called: NAACP v. A.A. Arms, et al.

2    THE COURT: I guess we have a number of issues on the

3 a again today this morning. Where do we want to start? Who

4 wants to start?

5    MS. BARNES: Well. You were for plaintiffs I think

6 we have the motion for a additional discovery and does

7 qualification of counsel and I also believe that we have the

8 incident report issue. So, I am going to take the additional

9 discovery and disqualification of counsel issue and if the

10 court if it's all right with the court I will go first.

11    THE COURT: That's fine. Go ahead.

12    MS. BARNES: Earlier this month the affidavit of

13 Robert Ricker who were a former trade association executive

14 and former in are a executive surfaced. As the court may

15 recall, I immediately wrote to this court and to the district

16 court indicating a need for action in this case that were

17 based on the facts there were presented by Mr. Ricker in his

18 affidavit. I in fact moved even before Mr. Ricker had agreed

19 to participate in this case on behalf of plaintiffs, in order

20 to notify the court of the issues presented and to begin the

21 process to deal with what I believed then, and believe even

22 more strongly now, would be a dislocation in the

23 representation of defendants in this case.

24    I am completely mindful of the impending trial date.

25 I'm completely mindful of the years that counsel at issue in

Page 6

1 this case have represented the defendants. I'm completely

2 mindful of the enormously tight schedule that this court

3 imposed and that we are all working to deal with.

4    Mr. Ricker's sworn statements, however, are highly

5 relevant to the issues in this action in which 85 gun makers

6 and distributors are charged with creating a public nuisance

7 that disproportionately affects my client, the NAACP,

8 Afro-Americans, and other NAAC members in the State of New

9 York. The issues in this case, as this court well knows, are

10 that the defendants have created this public nuisance by

11 facilitating the diversion of handguns from the -- I'm sorry,

12 from the legal to the illegal market.

13    First, Mr. Ricker's issues that he raises in his

14 sworn statement are relevant to defendants' notice, their

15 knowledge of the mechanisms of diversion of firearms, the

16 means by which firearms are diverted, such as straw purchases,

17 multiple sales. They are relevant on the issues of what ATF

18 told members of the industry, what ATF and members of the

19 industry discussed going back and forth with each other, what

20 the industry was told by BATF as to what steps they should

21 take that would assist government in regulating this disparate

22 and enormous and virtually unregulated industry. The issues

23 presented by Mr. Ricker also deal with the use and the

24 knowledge of the trace database by defendants in this action

25 and by counsel.

Page 7

1    Second, Robert Ricker's statements are relevant on

2 the issue of concerted action among members of this industry.

3 The joint or enterprise activities of members as presented by

4 Robert Ricker, and repeatedly consistently in sworn testimony

5 denied by members of this industry, in the prior case and in

6 this case, has liability implications for all defendants in

7 this action, particularly, Your Honor, some of the smaller

8 defendants or some of the defendants that I believe will move

9 before this court and before Judge Weinstein on a de minimis

10 argument saying that they were neither large participants,

11 significant participants, or disproportionately crime gun

12 defendants. And whether or not there is a viable joint or

13 enterprise liability scheme in place in this case will affect

14 how the court views the liability of those smaller

15 defendants.

16    These issues -- all of these issues are to be briefed

17 and heard soon. The papers I believe, Your Honor, for summary

18 judgment are due on the 24th of February.

19    THE COURT: Monday.

20    MS. BARNES: Yes, Monday, Your Honor.

21    There are two parts of plaintiff's application. One

22 is discovery and one is disqualification. I will take

23 discovery first.

24    In order to adequately prepare for summary judgment

25 and for trial, plaintiff moves now for very limited discovery

Page 8

1 against James Dorr, Timothy Bumann, Georgia Nichols, Michael

2 Saporito; and if the court will permit it, against Robert

3 Chiarello, Pat Squire, Robert Delfay, Steven Halbrook, and

4 Richard Gardiner. However, the initial four that plaintiffs

5 require most particularly are James Dorr, Tim Bumann, Georgia

6 Nichols, and Michael Saporito.

7    Discovery is needed against each of these attorneys

8 who are mentioned in Mr. Ricker's affidavit for the following

9 reasons: In Mr. Dorr's letter, he admits that there were

10 meetings. None of the papers submitted in any of the matters

11 -- in any of the submissions by counsel for the attorneys in

12 this case have disputed Mr. Ricker's claim that there were

13 meetings. Mr. Dorr further says in a letter to Your Honor

14 that these were networking meetings. Mr. Sanetti in his

15 papers to this court indicates that Mr. Dorr was not acting as

16 a representative of Sturm Ruger. Yet Mr. Dorr was present in

17 a meeting with Mr. Bumann, in-house counsel Michael Saporito,

18 Pat Squire, Georgia Nichols, an insurance company

19 representative by the name of Robert Chiarello, who it is my

20 understanding owns or manages the Captive Insurance Company

21 that insures all of these defendants, the National Rifle

22 Association, and the Citizens Committee to Keep and Bear Arms,

23 plaintiff now needs to know in what capacity James Dorr was

24 acting in these meetings. Was he a representative of a trade

25 association SAAMI, ASSC, NSSF? Was he a representative of the

Page 9

1  NRA, or was he in fact a representative of all of them, or was
2  he acting on his own?
3       We would request as part of Mr. Dorr's examination
4  his time records, his billings to his client, his notes and
5  memos to his clients, in order to validate his somewhat
6  difficult to believe claim that he was acting on his own.
7       Your Honor, I wasn't invited to do one of these
8  meetings.
9       THE COURT: Can I just, before you go a little bit
10 further, can you tell me, regardless of what he or in what
11 capacity he was there, why is it relevant to know that?
12      MS. BARNES: Why is it relevant to my case?
13      THE COURT: Why do you need that?
14      MS. BARNES: Your Honor, we need to know whether or
15 not he will -- first of all, we need to know was you acting on
16 behalf of his client for evidentiary reasons. What he says on
17 behalf of his client may be or may not be taken as admissions
18 that may be admissible in this case against him. That's
19 number one.
20      Number two, whether or not he's acting, in what
21 capacity he's acting, implicates either part A or part B of
22 the disciplinary rule. If his testimony is in support of
23 Mr. Sanetti's statement that there is no joint industry
24 activity, then it is on behalf of his client and he may not
25 testify. If it is in opposition to what his client is going

Page 10

1  to testify, then it falls under part B of the disciplinary
2  rule, and, again, he may not testify. But, Your Honor, I
3  don't even think we have to go there.
4       THE COURT: Let me just back up for a second.
5       I thought - and there have been a lot of papers, and
6  I have been trying to keep up with them - but I thought he had
7  said or his client had said that he was not going to be called
8  as a witness.
9       MS. BARNES: Your Honor, it is irrelevant. Yes, he
10 did say that, and, Your Honor, I would direct the court, and I
11 apologize that I did not initially put these cases before the
12 court, I will give you -- I spoke to Ms. Bo detective. I will
13 present the court with the cases right now. It is irrelevant
14 whether or not he's going to be called or not. The issues in
15 the case from Lanborn v. Dittmer, MacArthur v. Bank of New
16 York; two cases from this court, United States v. Orgad and
17 United States v. Locascio, indicate very clearly that if he
18 should be called, if he is in fact an unsworn witness in this
19 matter, he may not testify. He may not be a participant in
20 the case at all, because of the damage and the prejudice to
21 the proceedings here.
22      The reason to move now and to deal with this now is
23 that the consequences for going down the road and allowing all
24 of this to come in, and allowing Mr. Dorr to participate,
25 Mr. Bumann to participate, is that you run the very, very

Page 11

1  substantial risk of a mistrial and then reversal.
2       Under the cases coming out of this court, Locascio
3  and Orgad, those attorneys who were part of the underlying
4  facts and had particular knowledge of the facts at issue, the
5  facts at issue here being these meetings, those attorneys may
6  not stand in the well of the court and cross-examine, or
7  question, or even be part of the trial team that examines the
8  witness that is making those statements. The courts and the
9  Second Circuit have been very clear on this - the cases
10 involving Mr. Cutler - the courts have been very clear on
11 this, that it is prejudicial to the opposing party. It
12 subverts the role of the lawyer in the case. It impacts the
13 credibility of counsel and witness, and it would allow the
14 lawyers who have intimate knowledge by virtue of their
15 participation an unfair advantage both in dealing with
16 witnesses and in having their presence viewed by the jury and
17 by the judge, that either heightens their credibility, because
18 they have information that is not accessible to other
19 advocates who are simply the advocates of the case and are not
20 participants. So the very strong policies are that
21 irrespective of whether he will be called or whether he will
22 not be called, he should be called. And, thus, he may not be
23 a part of this case, and we need to deal with it now a month
24 before trial.
25      THE COURT: Let me stop you for a second because you

Page 12

1  lost me here.
2       First of all, I thought that you were making one
3  argument, but then you said something completely different, so
4  I want to make sure I'm following.
5       I thought what you were saying is that by standing up
6  and cross-examining Mr. Ricker on what happened at meetings
7  that Mr. Dorr was present at, and saying but isn't it true,
8  Mr. Ricker, that what I actually said was, he becomes an
9  unsworn witness?
10      MS. BARNES: Yes.
11      THE COURT: And that is your concern?
12      MS. BARNES: Yes, Your Honor.
13      THE COURT: There's nothing in the information that I
14 have seen that suggests that he should be called as a witness
15 otherwise.
16      MS. BARNES: He should be called to rebut --
17 Mr. Ricker stands up and says, Mr. Dorr and Mr. Bumann
18 counseled against the taking of safety precautions. They
19 counseled against the industry's adherence to the assault
20 weapons ban because all you had to do was change a name and
21 you would fall outside the ban. They counseled various
22 mechanisms for avoiding the responsible regulation of
23 firearms. That's what he's going to say. We were at
24 meetings. They all did it. There was agreement never to
25 disagree. Smith and Wesson stepped out of line. We can go

NAACP v. A.A. ARMS, et al    Case 2:99-cv-03999-JBW-CLP    Document 549-10    Filed 04/25/06    Page 4 of 21 PageID #: 1756    February 27, 2003

Condenselt™

Page 13

1 many, many places. That's what he will say, it implicates
2 joint activities. There's representatives of at least two
3 major trade associations, probably three. There's
4 intersections of distributors through Mr. Saporito and the
5 ASSC. There's old line manufacturers. There's new
6 manufacturers. They are all held in together. The NRA is
7 present. The Citizens Committee Right to Bear Arms is
8 present. The insurers are present dictating which lawyers are
9 going to be called, what is going to happen, who is going to
10 represent who. Mr. Ricker testifies to this extensive joint
11 activity, which we have never ever been able to obtain
12 discovery on. And now we have it, and now the issues need to
13 be aired, and this is what he will testify to. And then
14 Mr. Dorr and Mr. Bumann cannot get up and argue I didn't say
15 that. They become unsworn witnesses. It would be necessary
16 and the jury would need to know the rebuttal. Mr. Ricker says
17 Jim Dorr, you were there. That's going to go unrebutted.
18     THE COURT: Well, I'm sure there are, based on my
19 review of the affidavit, other people, other than Mr. Dorr
20 himself, who could get up and say actually I was at the
21 meeting, and Mr. Dorr did not say what Mr. Ricker is
22 testifying to. I heard him say X.
23     MS. BARNES: But his presence in the case as a named
24 person under the case law creates an unfair advantage to
25 Mr. Dorr, to Mr. Dorr's clients, and it vitiates the entire

Page 14

1 process, and it impugns the integrity of the court. Mr. Dorr
2 has, and Mr. Bumann apparently also, have unique knowledge
3 that is not available to other people, and this unique
4 knowledge is what makes him not capable and not acceptable to
5 be a witness, to be an advocate in the case.
6     So, I mean, in the first instance, Your Honor,
7 because I know it is an extraordinary remedy, it is
8 extraordinary relief we seek, allow us the discovery to see
9 what it is that he will say. If Your Honor would allow us ,
10 Georgia Nichols is within the subpoena power. Mr. Saporito I
11 understand is a former judge in this case. I believe he's
12 still a member of the New York Bar, I believe he can be
13 subpoenaed. Allow us to subpoena those people who are within
14 the subpoena power, and then take the depositions of Mr.
15 Bumann and Mr. Dorr, and we'll see after we have gotten their
16 time records whether or not they were in fact on that
17 particular day acting on behalf of their clients.
18     THE COURT: Other than Mr. Dorr, Mr. Bumann, and I
19 take it Ms. Nichols, are any of the other individuals who you
20     named, Saporito, Chiarello, Squire, Delfay, Halbrook,
21 Gardiner, are any of them acting as trial counsel in this
22 case?
23     MS. BARNES: No, Your Honor.
24     THE COURT: It is just those three?
25     MS. BARNES: And Mr. Renzulli's papers seem to

Page 15

1 indicate Ms. Nichols is not acting as trial counsel.
2     THE COURT: Okay. That's what I understood him to be
3 saying as well.
4     MS. BARNES: So she falls under a whole new
5 category. We would just ask for her deposition. She
6 apparently is quite intimately involved.
7     THE COURT: So the only disqualification that you are
8 seeking is Mr. Dorr and Mr. Bumann?
9     MS. BARNES: Yes.  And depending on what Mr. Dorr and
10 Mr. Bumann disclose, I mean, and I don't have this in an
11 affidavit form, Ms. Kimball has a relationship, although I'm
12 not able to now indicate what it is, it may be that after
13 Mr. Dorr testifies we'll find Ms. Kimball was also a
14 participant in a number of meetings. However, I don't have
15 that information, so my motion does not go to Ms. Kimball.
16     THE COURT: Mr. Ricker is not, as far as you know,
17 going to testify that Ms. Kimball was involved in these
18 meetings?
19     MS. BARNES: It's my understanding that - and just
20 because time has been limited - Ms. Kimball was involved in
21 one meeting. Whether or not it was a meeting, I have not,
22 Your Honor, been able to pursue whether or not it was a
23 meeting such as plaintiffs are relying on here where issues
24 regarding taking safety mechanisms to prevent the diversion of
25 firearms were discussed, motive issues were discussed. Let's

Page 16

1 not take these measures because it will open the floodgates of
2 liability.
3     I mean, Your Honor, Mr. Ricker's statements go to
4 motive of this industry as to why it was, when the rest of the
5 world is taking enormous safety precautions and the government
6 is telling them why it is that they never ever did it, they
7 closed rank. They imposed a code of silence. They imposed a
8 code of no dissention in the ranks, and were successful in
9 preventing the discovery of what Mr. Ricker has indicated is
10 considerable and is clear concert of action.
11     THE COURT: How do you respond, Ms. Barnes, to the
12 argument that they have made, which is that these were
13 lawyers' meetings. These were not meetings of the principals
14 of the entities, the people who actually are charged with
15 making the decision. Therefore, even if you are right, even
16 if what was being discussed by these lawyers was concerted
17 action, as you labeled it, it is irrelevant to the question
18 here because it doesn't show that what the companies actually
19 did was concerted action. It's just that the lawyers were
20 talking about it.
21     MS. BARNES: Well, Your Honor, one interesting part
22 of the arguments against plaintiff's motion is that there are
23 no affidavits from the principals of these companies to that
24 effect. This is just argument. And it does -- whether or not
25 it is called lawyers' meetings or it is called strategy

Page 17

1 meetings, the participants in the meetings and their
2 relationship to the entire industry, I believe, belies the
3 argument that these were simply lawyers' meetings among
4 outside counsel, as I'm sure that the lawyers in this case
5 meet all the time. I mean, they were meeting last week when I
6 was taking Mr. Vince's deposition. They were all meeting. I
7 assume they are organizing their expert witness matters. The
8 meetings that we are talking about here predate the NAACP
9 case. They apparently -- there is no privilege by the
10 presence of outsiders. They vitiated any privilege. They are
11 not all lawyers. The issue here is - just to look a little
12 bit larger -- there are these meetings in which a person who
13 is present at the meeting, who represented at the time a trade
14 association, says that this was gone on and this is
15 discussed. Then what we have is almost unified parallel
16 activity flowing from these meetings. We have it both in the
17 conduct of the litigation. We have it in the direct testimony
18 of every single one, except two, every single one of the 85
19 except two defendants that I can think of, the testimony is
20 identical on the issues of crime guns, ATF oversight,
21 knowledge of dealers, relationship with dealers, relationship
22 with downstream partners. That's one hand.
23     On the other hand, we have - and we have this and I
24 put this before the court, I apologize it wasn't sworn - but
25 we have the expert witness report of Dr. Gregory Gundlach.

Page 18

1 Professor Gundlach, as Your Honor knows, is plaintiff's
2 marketing expert who has spent an enormous amount of time in
3 1500 pages detailing in excruciating detail the practices of
4 each and every one of these defendants, and his findings are
5 that but for superficial differences, this industry has
6 followed identical distribution patterns that vary in the most
7 irrelevant ways.
8     His statement - and he is, by the way, an antitrust
9 expert primarily in the rest of his work - is that their
10 activity is shockingly parallel. So that's what we have, Your
11 Honor.
12     I'm cognizant of the fact that this is their
13 argument, and I believe that discovery will demonstrate the
14 parameters of whether or not what this is, networking, trying
15 to get new business, I don't know, talking about other things
16 or whatever, but given the uniform responses of the defendants
17 in this case, I believe that based on Mr. Ricker's statements,
18 it is plaintiff's obligation to both seek this discovery and
19 to notify the court of what we consider the tremendous import
20 of this information. Thank you, Your Honor.
21     THE COURT: All right. Thank you.
22     Whose going to speak first?
23     MR. HERFORT: May it please the court, John Herfort.
24     THE COURT: Mr. Herfort, you are a new face in this
25 crowd of familiar faces, so I kind of like to know who you

Page 19

1 are.
2     MR. HERFORT: I don't represent one of the companies,
3 Your Honor. I'm a partner in Gibson, Dunn & Crutcher, and I
4 represent Mr. Dorr and Ms. Kimball.
5     THE COURT: Okay.
6     MR. HERFORT: I think that there are two basic parts
7 of Ms. Barnes' motion that we need to look at.
8     First, the factual part, which is what Mr. Ricker
9 says, and more important what he really doesn't say; and the
10 second part is the law.
11     I think on the law, which I will get to in a bit, it
12 is quite clear that you have an extraordinarily strong burden
13 not only to reopen discovery after it's been closed for nearly
14 six months, but to take lawyers' testimony, and that's covered
15 in an opinion of Judge Weinstein himself, as well as to
16 disqualify. But turning to Ricker himself, who is the sole
17 basis for us being here today. There are a couple of points
18 to be made.
19     When you look at his affidavit, okay, the first part
20 of it describes his personal experience. That's not what why
21 we are here. Paragraphs seven through fifteen talk about
22 various individual practices or non-practices of the
23 industry. It is broad brush characterization, nothing to
24 suggest it is firsthand knowledge, and it doesn't pinpoint any
25 particular defendant, group of defendants, or big group of

Page 20

1 defendants. It is just a discussion of industry practices or
2 non-practices that anybody who has followed the gun control
3 debate over the last 20 years has been familiar with whether
4 you are an expert in this case or not. So when you get up to
5 paragraph sixteen, there is nothing new.
6     There's also nothing new about Mr. Ricker himself.
7 His tribulations with the industry such as they are, his
8 leaving the industry, have been well known for years.
9 Mr. Ricker is not some character who suddenly appeared out of
10 the woodwork in early 2003. Newsweek, as we point out in our
11 brief, has brought out an article with his tribulations with
12 the industry in 1999, when he left the industry. So the
13 notion that Mr. Ricker is a newly blooming character is simply
14 false. It is absolutely false, and we all know that.
15     The other point about Mr. Ricker is -- several other
16 points. When you look at paragraph 16, which is the pivot, in
17 fact it is the exclusive, basis for the motion today, what
18 does it say? It doesn't talk about any particular practice at
19 all. Ms. Barnes says he's going to talk about ATF, BATF, all
20 sorts of specific things that were alleged, discussed at this
21 shot show meeting. Your Honor, it is not there. Ms. Barnes
22 is testifying that Mr. Ricker. Mr. Ricker never says anything
23 of the sort, and you can read paragraph 16 over and over and
24 over again. Unfortunately I have done that. It simply
25 doesn't say it.

Page 21

1    Now, the issue of joint activity, which is what Ms.
2  Barnes says that Mr. Ricker is somehow going to help her
3  prove, that's not a new concept for this case.
4    If you just focus on Mr. Dorr's client, and you look
5  at the 30(b)(6) notice that they got, it is in our brief, it
6  is a 30(b)(6) notice that says that Sturm Ruger has to produce
7  someone who is going to testify not only as to individual
8  activity of the company with respect to marketing,
9  distribution, and so on, but also joint activity with other
10  members of the industry and with associations.
11    Your Honor, Ms. Barnes took Mr. Sanetti's
12  deposition. It is a very long deposition. She doesn't ask a
13  single question about joint activity or associational
14  activity. So this concept that she says now is going to drive
15  this case on liability is something she totally ignored when
16  she took the one Sturm Ruger deposition that she wanted to
17  take. It was in her notice and she ignored the topic, so we
18  think it is a little late.
19    The issue of shot shows, which is the name of this
20  meeting that Mr. Ricker briefly discusses in this one
21  paragraph of his affidavit, is that a new factual issue for
22  this case? Certainly not.
23    In the Hamilton case, which Ms. Barnes refers to off
24  and on through her papers, in the Hamilton case she had
25  deposition testimony. She took testimony and she talked about

Page 22

1  the shot shows. So the notion that the shot shows is
2  something new that suddenly fell upon us at the end of
3  January, when Mr. Ricker finally filed his affidavit, that's
4  false.
5    THE COURT: But let me interrupt you for a second,
6  because I have to say I'm not familiar with what responses to
7  her questions were in those depositions about shot shows.
8    But was it revealed in those depositions that she
9  took that Mr. Dorr, Mr. Bumann, some of the other names that
10  we heard in Mr. Ricker's affidavit, were present at those shot
11  shows and discussed the various items that Ms. Barnes is
12  claiming Mr. Ricker is going to be discussing?
13    MR. HERFORT: This is discovery from the prior case
14  which is gone.
15    THE COURT: Right.
16    MR. HERFORT: I don't think she pushed to that point.
17    THE COURT: Well, okay. I don't know if she did push
18  to that point or didn't get responses.
19    MR. HERFORT: My only point is she ignored the shot
20  shows in this current case, and this current case has been
21  around since 1999, and the shot shows came up in Hamilton.
22    THE COURT: My question, maybe it is an unfair one to
23  you because you are in fact new to this case, but it was my
24  understanding that perhaps the reason she didn't push on some
25  of these things was because the answers that she was getting

Page 23

1  were that nothing went on along the lines of what we are now
2  hearing from Mr. Ricker. That what we are hearing from
3  Mr. Ricker contradicts the information that she had previously
4  gotten from the various deponents in the Hamilton case, and, I
5  suppose, believing that she would get the same answers here,
6  she didn't press them in this case, but maybe I'm wrong.
7    MR. HERFORT: That's not what she said in her papers.
8    THE COURT: I will let Ms. Barnes respond.
9    MS. BARNES: That's exactly right, Your Honor, that
10  was clearly laid out in the first case, and we had such a lot
11  to do and so little time, there was no reason to believe it.
12  Precisely right, Your Honor.
13    MR. HERFORT: Your Honor, there is. I was just given
14  a transcript before Your Honor in 1995, and in the Hamilton
15  case of all things.
16    THE COURT: Was I even a judge then?
17    MR. HERFORT: You were apparently there, and you were
18  identified.
19    THE COURT: It must be me.
20    MR. HERFORT: I don't know what else to say.
21    THE COURT: Unfortunately I'm sure I don't remember
22  what I said then.
23    MR. HERFORT: In subpoenaing counsel that issue came
24  up, and Ms. Barnes had some comments here, and it's at pages
25  72 to 73 of the transcript.

Page 24

1    THE COURT: I'm sorry, what is the date?
2    MR. HERFORT: December 4, 1995.
3    MS. BARNES: I think it's Exhibit C.
4    MR. HERFORT: May I approach the bench, Your Honor?
5    THE COURT: Sure.
6    MR. HERFORT: It starts here on 71. It says THE
7  COURT. And then we have Ms. Barnes saying - this is back in
8  the old case: Your Honor, if I may? I held off because it is
9  very -- I'm aware of the weightiness of -- in issuing
10  subpoenas involving counsel in the case. As you've noted, I
11  have not subpoenaed the other ones because Mr. Dorr and Ms.
12  Kimball have appeared for years at the Sporting Arms and
13  Ammunition Manufacturer's Institute and they have been
14  represented there as being there as counsel. They are not
15  there in their individual capacities. There was, obviously,
16  no basis to deal with them in the same way.
17    Then she goes on to say that - at the top - she sort
18  of characterizes the industry and so on.
19    I can give this to you, but, I mean, that was not
20  pursued. She raised the very issue she's talking about
21  today. She raised it seven and a half years ago. My
22  understanding, Your Honor, is that she dropped it seven and a
23  half years ago, and now we are almost exactly a month from
24  trial and we hear of the well-known, not little known or
25  recently discovered, but the well-known Mr. Ricker. And what

## Page 25

1 does he say? He doesn't talk about individual practices. He
2 doesn't talk about individual company behavior in connection
3 with the practices. He talking about, in paragraphs seven to
4 fifteen, he merely says that some lawyers, many of whom are
5 not counsel of record in this case, had some meetings in which
6 they talked about action, not any specific action. And the
7 notion that this case is going to pivot on a broad brush
8 concept of action, as opposed to specific action, I think is
9 beyond the pale. We know it's going to focus on specific
10 actions. Ricker doesn't, and I think for almost that reason
11 alone there's a serious question as to his relevance at all.
12      The concept of the lawyers hear having intimate
13 knowledge, and the reference to of all people Bruce Cutler in
14 a case like this, I think frankly is almost beyond the pale.
15 We all read these opinions involving Mr. Cutler, and
16 Mr. Cutler was disqualified for a very simple reason, Judge
17 Glasser found that Mr. Cutler, another one of the defense
18 lawyers, served as the cement which held a RICO criminal
19 enterprise together. So the issue is not simply their
20 activities as lawyers.
21      The only thing that suggested in our case that
22 involves activities as lawyers, it was activities as people
23 who held together the Gambino family's criminal enterprise by
24 receiving benefactor fees, by defending other people, by
25 keeping people quiet and pleased. So the notion that this

## Page 26

1 case can be compared to the Bruce Cutler situation by analogy
2 is frankly an insult. It's an insult to the client and I
3 think it is an insult to the record.
4      THE COURT: How do you respond to Ms. Barnes'
5 argument that if Mr. Dorr is acting as trial counsel, and is
6 called upon to cross-examine Mr. Ricker, he becomes
7 necessarily an unsworn witness?
8      MR. HERFORT: Well, I think, first of all, we have to
9 see what Mr. Ricker is going to say. If Mr. Ricker says what
10 he says in paragraph 16, it is not all clear to me that
11 anybody who will cross-examine him because his testimony will
12 be utterly meaningless.
13      THE COURT: I understand that.
14      MR. HERFORT: Let's assume it becomes meaningful,
15 which is speculation. Mr. Dorr probably won't cross-examine
16 him. Other people will be at the bench, and there are other
17 witnesses. The key point is under the disciplinary rules
18 there are other witnesses. There are other witnesses that can
19 be called to support Mr. Ricker. She's mentioned some who
20 were not involved as counsel of record in the case, and there
21 are other witnesses that can be called as defense witnesses to
22 rebut Mr. Ricker, if necessary.
23      THE COURT: I understand that point.
24      MR. HERFORT: The question is, is Mr. Dorr going to
25 be vouching for them?

## Page 27

1      THE COURT: That's the question, either in
2 cross-examination or on what Mr. Dorr's position is going to
3 be at the trial. If he's going to be the lead counsel for his
4 client, he's going to be the one that stands up and does the
5 summations, where, again, it's not just cross-examining
6 Mr. Ricker, but in summation he could be seen defending on
7 what is said as an unsworn witness.
8      MR. HERFORT: Your Honor, I think to say that it gets
9 us into an area of speculation which is far beyond the kind of
10 showing you need to think about changing counsel at this date.
11      THE COURT: But let me ask you this --
12      MR. HERFORT: The reason is we don't know what Ricker
13 is going do say.
14      THE COURT: But here's my problem, Mr. Herfort. I
15 understand what you are saying, and you are right, it is
16 speculation, but we won't know what Mr. Ricker is going to say
17 until he actually takes the stand, if he takes the stands, and
18 says what he's going to say. Even if you take his deposition,
19 we may not know exactly what he's going to say. When he gets
20 up on the witness stand, you all know things come up during
21 cross-examination that have never been said before. So, you
22 are right. But the job that I have to do here necessarily
23 involves some degree of speculation, otherwise we are going to
24 get to the point where Mr. Dorr is up there, and just using
25 Mr. Dorr because he's your client, it could be Mr. Bumann or

## Page 28

1 any of the other named attorneys here, and something comes up
2 during cross-examination and we have a mistrial. I'm sure
3 Judge Weinstein doesn't want to have that happen.
4      So I guess my question is, how can I protect against
5 that, at this point along the way?
6      MR. HERFORT: I think the way you protect against it
7 is by requiring a very strong factual showing, which is what
8 all of the disqualification cases in her brief and our brief
9 say you have to have. If you can disqualify a lawyer on the
10 eve of trial with a late blooming witness who says there's an
11 event as to which one of the lawyers has some knowledge, Your
12 Honor, what you have done is you took the standards for
13 disqualification under DR 5-102(C) and (D) and I think you
14 pushed them far beyond where they properly go. You have to
15 have it. The standard in the statute is obviousness, and the
16 drafters of the disciplinary rules don't use the word
17 "obvious" lightly. It has to be absolutely clear that you
18 are going to have the problem of the lawyer acting as witness
19 and vouching that you believe that requires disqualification.
20 Also the necessity standard, which we talked about in our
21 brief, which I think is the other point, because there are
22 other witnesses.
23      But I think what Your Honor is getting at is, are you
24 going to have an inescapable tendency where the lawyer in
25 effect is going to be an unsworn witness vouching for the

Page 29

1  opposite of some story or the story he wants to propound to
2  the trier of facts? The answer is, it's not obvious at all
3  here, and it's far too early to suggest that it is.
4      As I said, let's go back to the whole basis for this
5  motion.
6      The whole basis for this motion is one paragraph out
7  of 21 in Mr. Ricker's affidavit. Mr. Ricker simply talks
8  about some lawyers at, or many of them at one particular trade
9  association meeting in the '90s. He doesn't talk about those
10  lawyers' connections to any individual trade practice. He
11  doesn't talk about any individual trade practice being
12  discussed by those lawyers. He doesn't remotely suggest - and
13  believe me, if he believed it, he surely would give given his
14  hostility to the industry - he doesn't remotely suggest that
15  the commercial decision-making to have or not to have a
16  particular knowledge of marketing distribution was the
17  function of what those lawyers did or didn't do at this
18  particular trade meeting. So we have to keep a sense of
19  formality here.
20      You have to look at that paragraph and what Ms.
21  Barnes talks about Mr. Ricker, and put it in a context of the
22  case. If it is a big circle in the center of the case, that's
23  one thing. The cases she cites in the Fifth Circuit and one
24  in the New York courts, one of the lawyers was responsible for
25  the whole case itself, one negotiated contract. They were

Page 30

1  fighting about the core principal we are talking about, no pun
2  intended. It has to be at the heart of the case. And it's
3  beyond me, based on what we know about this case today, what I
4  have been able to learn last week, that the shot show meetings
5  among nine lawyers and no businessmen are the core of this
6  case involving the various practices or non-practices. You
7  have to be at the core of the case, under Ms. Barnes' own law,
8  to invoke the lawyer vouching problem as a basis for his
9  disqualification. To compare it to Cutler's case, Cutler and
10  Shargel were at the core, at the core, of the Gotti RICO
11  conspiracy trial. Their behavior was at the core in numerous
12  ways, and you can read Judge Glasser's opinion.
13      THE COURT: I read it.
14      MR. HERFORT: It's an endless catalogue citing about
15  30 different quotes from wiretap evidence of specific actions
16  or known actions or representation of other people receiving
17  money to represent other people, that Mr. Cutler and
18  Mr. Shargel allegedly were involved in. That's a far cry from
19  what we are talking about today. So I think you have to look
20  at what this case is, the importance of the single paragraph,
21  and the fact that there are other witnesses which goes to the
22  necessity standard, and I think you have to look at the
23  language of the disciplinary rules to be candid. The word
24  "obvious" is a pretty strong word, and I don't think it is
25  remotely close to being satisfied here.

Page 31

1      THE COURT: All right.
2      Let me hear from Ms. Barnes.
3      MR. HERFORT: Can I address one thing about the
4  depositions?
5      The depositions, Your Honor, I think maybe I just
6  wanted to briefly anticipate the argument that, well, let's
7  not talk about disqualification now, because we'll deal with
8  that after we have depositions. Depositions, as I think we
9  all agree after six months after discovery has ended, are a
10  strong remedy anyway, and I don't believe she's shown they are
11  necessary. But deposition of lawyers, of all people, very to
12  satisfy three standards that Judge Weinstein articulates in
13  the All Funds on Deposit case, which is cited I think in just
14  about everybody's brief except for Ms. Barnes. The first
15  standard is, is there no other way to obtain the
16  information, is there no other way to obtain the information
17  about the shot show meetings besides going to Jim Dorr and to
18  Mr. Bumann? I think not.
19      THE COURT: Forget Mr. Dorr and Mr. Bumann for a
20  minute, okay. Let's put them aside.
21      I would like you to address the question of whether
22  or not she should be permitted to take the depositions of some
23  of the other participants in this meeting, who are not active
24  trial counsel in the case.
25      MR. HERFORT: My view is no, and the reason my view

Page 32

1  is no is because it is too late. This material has been
2  available for a long time. There's nothing new. Mr. Ricker's
3  problems an animus towards this industry have been well-known
4  at least since 1999.
5      THE COURT: Okay. Let me stop you here again and ask
6  you this question: The information that Mr. Ricker reveals in
7  the affidavit regarding these, paragraph 16 if you will, that
8  is well-known and has been revealed in the industry for a long
9  time?
10      MR. HERFORT: No, as such it has not.
11      THE COURT: Okay.
12      MR. HERFORT: But let me say -- let me answer your
13  question. The allegations in paragraph 16 about what one
14  particular person said or opposed, I have not, but what is
15  known is the following, that these lawyers' meetings at the
16  shot show conventions did occur. That they were attended by
17  some or all of the characters that Mr. Ricker now says
18  attended them. Mr. Ricker's concern over the industry's
19  so-called practice of not reforming itself has also been
20  well-known. It's been well-known since 1999. That's one of
21  the reasons he was ultimately terminated from the industry.
22  He's thoroughly forthright about that.
23      So the idea that these three old topics, Mr. Dorr
24  going to these meetings themselves and Mr. Ricker's problem
25  with the industry, should be the basis for out-of-time

Page 33

1  depositions, and it doesn't matter of whom, I think stretches
2  it a bit far. She knew -- Ms. Barnes knew about these
3  meetings. She knew the information I just gave you about
4  that. She didn't pursue that in Hamilton, Mr. Dorr going to
5  these meetings back in 1995. She is not going to tell you
6  about Mr. Ricker, or Mr. Ricker's position vis-a-vis the
7  industry. Everybody knew about that since 1999 when he left.
8  So what is the basis for forcing us, forcing anybody, the
9  court, the lawyers, the prospective possible deponents,
10 besides Mr. Bumann and Mr. Dorr, what is the basis for forcing
11 them to engage the subject of discovery, when we do have a
12 standard that I think governs it here?
13     THE COURT: Well, I have to say this, Mr. Herfort,
14 despite my involvement in this case and the prior case, I was
15 not aware of Mr. Ricker's position vis-a-vis what was said by
16 these attorneys at these meetings. So when I read the
17 affidavit, it came as nothing of a surprise to me.
18     Now, maybe you are right, maybe Ms. Barnes has known
19 about it for years, as you suggest. But, again, I would have
20 to say I'm surprised she didn't bring it up sooner, that she
21 brought it up immediately after the affidavit appeared in the
22 California action. So I guess I am going to have to ask her
23 that. But I will say that despite what you are saying, I'm
24 not sure everyone was aware of what Mr. Ricker had to say in
25 paragraph 16.

Page 34

1      MR. HERFORT: Your Honor, I don't think that the
2  issue is really what was aware. The issue is what a
3  reasonably diligent lawyer would have done in the time
4  allotted to generate evidence to help.
5      THE COURT: But if everyone is telling her the
6  opposite, then I don't know how she's going to develop --
7      MR. HERFORT: Your Honor, Mr. Ricker -- if there's
8  evidence that Mr. Ricker has been hiding it alludes me. We
9  have known since 1999, and Ms. Barnes has known since 1999,
10 that Ricker was out there, that he's a critic of the industry,
11 he doesn't like the industry. He's concerned that the
12 industry allegedly didn't do some things in terms of
13 self-reform, or self-regulation, or however they want to
14 characterize it, that they should have done.
15     Why didn't Ms. Barnes in the time that she had talk
16 to Mr. Ricker, or why didn't she probe the issues that she
17 raised, but didn't follow in Hamilton in 1995, when she took
18 Sturm, Ruger's deposition? She took the deposition with
19 Mr. Sanetti. I hate to burden you with it. It is a long
20 deposition. It's an exhibit in our book. It is a
21 deposition. She had plenty of time. We would have given her
22 more time. But the bottom line is, look at her deposition
23 notice, the deposition notice to Mr. Sanetti, involved with
24 his lawyers. Her very deposition notice talked about joint
25 activity, as well as individual activity.

Page 35

1      In terms of marketing, distribution, and the things
2  involved in this case, I think that she flunks. She frankly
3  flunks the due diligence standard of discovery in this case.
4  She never got to Ricker, and she never asks Sanetti any of the
5  questions that were suggested in her own deposition notice
6  about joint activity. That's the best way I can answer your
7  question.
8      THE COURT: All right. Let me ask her about those
9  things.
10     MR. JOSEPH: May I be heard on behalf of Mr. Bumann
11 for a few moments?
12     THE COURT: If you have something to add, that's
13 fine.
14     Who are you?
15     MR. JOSEPH: Gregory Joseph for Mr. Bumann.
16     THE COURT: Are you with a firm?
17     MR. JOSEPH: My own firm, Your Honor.
18     THE COURT: Okay.
19     MR. JOSEPH: Your Honor, I would just like to focus
20 on a couple of questions that Your Honor has asked,
21 specifically about disqualification, really, because of
22 attendance at a meeting, which is a very fair question,
23 because there are several cases that specifically address it
24 and say no disqualification. If I could direct Your Honor
25 specifically to the brief we filed. I'm looking at page 8,

Page 36

1  the Perretti case from the Southern District: "To the extent
2  that a party made an admission at the July and October
3  meetings, there are five different persons who can testify
4  about what the parties said or did; therefore, the attorneys'
5  testimony would be merely cumulative. The test under the rule
6  is, is it necessary or merely cumulative. The fact that she
7  requested additional testimony, which she can take at trial or
8  at deposition, demonstrates it is not necessary.
9      The Herr case, also from the Southern District:
10 Given the large number of witnesses to the events at the three
11 union meetings, any testimony attorney Brodsky could offer
12 would be merely cumulative. No disqualification. He may act
13 as counsel on all issues of fact.
14     S & S Hotel, a New York Court of Appeals, and it is
15 New York Court of Appeals ruling under Rule 5-102: Plaintiff
16 did not dispute its attorney Sassower participated in
17 negotiations or communications with defendant. However, it
18 was error to give no recognition to plaintiff's contention
19 that Sassower's testimony was not material or even necessary,
20 because her testimony would be at most be cumulative or relate to
21 matters of formality.
22     And the Plotkin case from the Appellate Division:
23 Respondents have failed to rebut the plaintiffs' contention
24 that the plaintiffs themselves were present during various
25 conferences and available to testify to the key events

Page 37

1  surrounding the parties' dispute concerning the house
2  construction plans.
3      When others are present, you don't satisfy the rule.
4  I just would like to spend a second on the text of the
5  ruling. That's something nobody mentioned. 5-102(A) is
6  governing. It says: A lawyer shall not act as an advocate on
7  issue of fact before any tribunal, if the lawyer knows or it
8  is obvious that the lawyer ought to be called as a witness on
9  a significant issue on behalf of the client. All right.
10  "Ought" is not merely "should." "Ought" is necessary. If it
11  isn't necessary, EC5-10, ethical consideration, says: Merely
12  cumulative that's not disqualifying.
13      For three of Mr. Bumann's five clients he did not
14  even represent them at all during the time of these meetings,
15  Rossi, Heritage and Braztech. Braztech wasn't even in
16  existence until December of '97. We have sworn testimony
17  which is unrebutted from the other two that he did not act on
18  their behalf at any meetings. This is the Declaration of
19  Mr. Morrison on behalf of TIMI, paragraph two. This is
20  contrary to what counsel said.
21      So I think it is important Mr. Bumann has never
22  represented TIMI at any meeting with authority to set policy
23  for TIMI, nor has he ever represented TIMI at any trade
24  association at which TIMI is a member. TIMI has never given
25  to Mr. Bumann -- given Mr. Bumann such authority.

Page 38

1      We have exactly the same testimony, slightly
2  different words, from Mr. Murgel. I mean, this is actually an
3  unprecedented and dangerous motion. Lawyers who specialize in
4  various areas of law often go to trade shows, not paid by
5  client to go to trade shows. They will meet with other
6  lawyers who represent similar clients and discuss issues.
7  They are not paid by clients to do this and are not
8  representing clients when they do this. They are, therefore,
9  having nothing to do with any concerted activity that the
10  plaintiff may want to show. But to start disqualifying
11  lawyers because of meetings they attended, not on behalf of
12  clients, but if anything to generate clients, is
13  unprecedented. It is not necessary. The participation of
14  these gentlemen, and Mr. Bumann in particular, would not only
15  taint the trial, it's essential for his client and it is in
16  5-102 an exception.
17      Even if there were necessity, which there is not, and
18  under the S & S Hotel case from the Court of Appeals, it
19  couldn't be clearer. It says: Testimony may be relevant and
20  even highly useful but not strictly necessary, if it's
21  cumulative. There's an exception as to any matters, if
22  disqualification as an advocate would work a substantial
23  hardship on the client because of the distinctive value of the
24  lawyer as counsel in the particular case. Professor Simon,
25  who is the leader and authority on New York ethics says: The

Page 39

1  distinctive value of a lawyer comes from participation up to
2  the eve of trial, that is distinctive value, that is intimate
3  familiarity. Summary judgment motions due on Monday, trial
4  one month from Monday, the Second Circuit in Nyquist
5  emphasizes this is a drastic remedy that this plaintiff is
6  seeking; and the Locascio case says the same.
7      I noticed the opinions that counsel does cite are
8  criminal cases, but if you look at the analytical framework,
9  this is a drastic measure. And the court here in the Southern
10  and Eastern District Asbestos cases says that the plaintiff
11  has a very heavy burden of proving facts necessary for
12  disqualification. Plaintiff says, why do we have to speculate
13  at this point? That's not enough for disqualification. That
14  itself like noticing other people's depositions demonstrates
15  there's no necessity.
16      Three standards at the time for Judge Weinstein: No
17  other way to get the information except from deposition of
18  Mr. Bumann. They demonstrated that's incorrect. There are
19  other -- seven other witnesses, apart from Mr. Ricker
20  himself.
21      The second part has to be relevant and unprivileged.
22  For three of his five clients he didn't represent them at all
23  at the time, and the other two affirmatively say we didn't pay
24  him; he was there on his own.
25      Lastly, it has to be crucial to the preparation of the

Page 40

1  the case. That's something that if it was crucial, why didn't
2  she depose him before? She appreciates she didn't know about
3  it.
4      There's no claim that anything Mr. Bumann did was
5  evasive about these meetings. The fact she's now uncovered
6  them may be a reason to call Mr. Ricker at trial. She may
7  want to call Ms. Nichols for a trial one month away. Why is
8  it necessary to reopen discovery? The three-part test from
9  the All Funds case is not satisfied, and for the same reason
10  it is not necessary that they testify at trial. They said we
11  are not calling these guys. They didn't act for us at the
12  time. Two others didn't know him at the time. And the other
13  two said he's unlawyered, he wasn't there acting for us,
14  trying the case for us. The fact that lawyers go to trade
15  shows and talk about business among themselves is not grounds
16  for disqualification and not concerted action if they are not
17  being paid. I'm not impugning anyone's motives, Your Honor,
18  here. They have a heavy burden to bear and they haven't borne
19  it. Thank you, Your Honor.
20      THE COURT: Thank you, Mr. Joseph.
21      MR. RENZULLI: I represent Ms. Nichols, and I think
22  you had a question about that. I'm not sure you got an
23  answer, so I'm about to do that, if you give me a couple of
24  minutes.
25      THE COURT: Tell the court reporter your name.

Page 41

1   MR. RENZULLI: John Renzulli on behalf of Ms. Georgia
2   Nichols, and general counsel of K.B.I. Inc.
3        The real issue, and I apologize I have been running
4   through deposition transcripts of 13 clients to try to get
5   ready for this trial and didn't have a real opportunity to
6   read all of the papers, and certainly I don't read cases
7   because they confuse me, but the bottom line issue is this,
8   the real issue here is whether this affidavit that had been
9   submitted is out of time. Nobody has raised that.
10       THE COURT: Mr. Ricker's affidavit?
11       MR. RENZULLI: Mr. Ricker's affidavit. What about
12   Mr. Ricker and what he says? I just turned around for a
13   second and I saw a reporter in the courtroom. That reporter
14   has reported in the newspaper, I believe it is the Wall Street
15   Journal, I'm not sure, I'm almost sure, all of the events
16   which are now situated in this affidavit that was submitted by
17   Mr. Ricker, all of the events.
18       The fact that there were shot shows, the fact of the
19   tampering in 1997 incident, I'm not sure what that was all
20   about, was all a matter of public record. That's number one.
21       Number two, the reason why we have a relatedness
22   doctrine in the district court is so that there's a continuity
23   and purpose in cases, and that they go to the same judge who
24   has reviewed the issues, or the magistrate that reviewed the
25   discovery issues. While I vehemently oppose that the

Page 42

1   relatedness of this doctrine applies in these cases, the
2   bottom line here that we forget, there's a key ingredient in
3   this case and in the Hamilton case that we are all turning a
4   blind eye to, a full day of Richard Feldman, the executive
5   director of the ASSC, boss and capo of Robert Ricker. The
6   bottom line is, all of this was laboriously gone into in eight
7   to ten hours of deposition of Mr. Feldman, pleadings -- as a
8   matter of fact somebody gave a snippet, one of these lawyers,
9   about the fact that he was on the ASSC, and you might remember
10   that Ms. Barnes laid a subpoena on me. These were all issues
11   that were taken up in 1996 for about eight hours.
12       Concerted actions, what did the lawyers say? What
13   did the clients say? What about this voluntary program? That
14   was all done. This is water under the bridge. What this is
15   is a vice. What this is a diversion to get this case to
16   trial. And, as I understand it, Judge Weinstein wants this
17   thing to go, and wants it to go on a certain date, and we are
18   ready to go.
19       Now, let's look at - again I have not studied this to
20   a great extent and I don't represent Squire or Delfay, who is
21   not even listed in paragraph 16, I don't even see a reference
22   to Robert Delfay, I don't know how he snuck in in this case, or
23   somebody who should be deposed.
24       THE COURT: Mr. Renzulli, enlighten me, who are Mr.
25   Squire and Mr. Delfay?

Page 43

1   MR. RENZULLI: Mr. Squire I think had a company
2   called Powder Horn.
3        MS. BARNES: Your Honor, Mr. Squire was head of Colt,
4   and he was also head of Interarms, two major defendants in
5   both the Hamilton action and in this action, Your Honor.
6        MR. RENZULLI: Your Honor, Pat Squire in my error and
7   I'm not pretending that I'm young because I'm not was an
8   expert witness in a company he did that for was called powder
9   horn I believe, okay. Mr. Halbrook, I believe, and
10   Mr. Gardiner are lawyers who take a pro-gun position. That's
11   about as much as I can do on that.
12       I know that Don Kates has written books about crime,
13   and gun control, and things of that nature, and I have read
14   some of the things that Don Kates has written. I don't know
15   how they fit into this.
16       Robert Chiarello, who is listed in paragraph 16 as a
17   general counsel or industry in-house counsel, if you look
18   there, I think it is about eight lines down, is an insurance
19   broker who writes insurance for product liability companies,
20   including guns and machines. He also writes policies, auto
21   policies and property policies. Why that poor man is dragged
22   into this I have no idea, other than the fact if you write a
23   policy for a gun company, you are somehow complicit in gun
24   activity.
25       I know who Robert Chiarello is. I have had dinner

Page 44

1   with him many times. I know his wife and children. If you
2   look at the affidavit very closely, the issue of Feldman and I
3   advocating proactive approaches, Feldman was deposed in 1996,
4   again for ten hours on that very issue. That's number one.
5        Number two, there seems to be, if we look, you know,
6   beneath this affidavit an argument that the industry does not
7   take any voluntary action on safety issues. Ms. Connell
8   reported, and reported correctly, that the industry met with
9   the president in 1997 and 1998 on a voluntary lock program.
10   What am I getting at? He said, she said. Mr. Ricker's
11   affidavit, if he is so permitted to testify in this trial, I
12   think it is off time, but let him get on the stand, Your Honor
13   and, let him testify to what he thinks he needs to testify to
14   further the plaintiff's case. There was a very -- you asked a
15   very practical question. I don't think you will see, and I
16   can represent to these guys they are not going to get up
17   there, assuming Mr. Bumann and Mr. Dorr does the summation in
18   this case, and say -- and Judge Weinstein won't allow it, you
19   know, that Ricker, he's a dirty rotten liar because I was at a
20   meeting where I never said that.
21       First of all, Judge Weinstein won't allow that.
22       Number two, I can assure you that's not going to
23   happen. Mr. Ricker will be cross-examined on the basis of his
24   affidavit. This is not at witch hunt. We are not going to
25   take insurance agents' depositions, or Don Kates because he

Page 45

wrote a book about, you know, pro-gun control, or Ms. Nichols who at the time, as listed in paragraph 16 - and I will take Ricker's word as true - was general counsel for O.F. Mossberg & Sons, a nonparty to this case.

Why that testimony would be relevant, and what O.F. Mossberg believed about voluntary controls, et cetera, I can tell you because I represent them, they were the first company in 1987 to have locks sent with all of their guns, all of their shotguns. So what this is is, if the court believes that Ricker is not out of time, then let him get on the stand and let him be cross-examined. That's what a trial is all about. If there is some inaccuracies here, they will be exposed. There's no need. And I think what Ms. Barnes is trying to do is bolster what Mr. Ricker is saying by getting Don Kates, some guy who wrote a pro-gun control book, or Mr. Bumann, because he was marketing at a shot show, which is irrelevant, absolutely irrelevant.

This is not a bolstering exercise, Your Honor. The HCI, the BBC, the anti-gun forces, are all out there. Everybody knew Ricker was out there. He was Feldman's right-hand man. Feldman was deposed in 1996. This is much to do about nothing. There is nothing new here. Let's go to trial. Let's get back to what we are supposed to do, and what Judge Weinstein wants us to do.

By the way, I'm not representing Chiarello, Squire,

Page 46

Delfay. I'm pro bono on this Nichols deal. So, you know, if the court is inclined to take their depositions, would you allow them to put in papers, I guess, to defend themselves in some way. Again, maybe I don't even have standing to ask this. I think out of common courtesy we are dragging people out that have a certain maybe pro-gun viewpoint based upon their studies and dragging them into this courtroom to answer Ricker's allegations is a little unfair.

THE COURT: Well, I will take your request under advisement.

MR. RENZULLI: Thank you, Judge, and thank you for listening.

THE COURT: Sure.

Okay, Ms. Barnes, do you have anything you want to say in response?

MS. BARNES: Yes, Judge, just a couple quick comments.

Mr. Delfay is head of this SAA, Supporting Arms and Ammunition Manufacturers Institute, and head of the NSSF, which is another trade association linked with Sammy.

Your Honor, I can only say that I did not know of Bob Ricker, and if the court will recall, I am the person who brought forward the prior industry insider, Mr. Robert Haas. So I feel I have a little bit of credit with trying at least to do some work in the case. But. Anyway.

Page 47

THE COURT: Let me just ask you, you didn't know about Mr. Ricker at all, or you didn't know what he was going to be saying?

MS. BARNES: I vaguely recall his name being on ASSC documents, and counsel has provided a Newsweek article that is still completely unenlightening because in paragraph one it says strange credentials for a guy who just became the new public face for the nation, is a leading handgun manufacturer. That seems to indicate to me that he is still bound hip to jowl to the industry, had no knowledge of anything about Mr. Ricker saying anything about what his meeting would be.

THE COURT: And you didn't see the Wall Street Journal article that Mr. Renzulli spoke of?

MS. BARNES: The article that Mr. Renzulli is discussing is not about this. It is my understanding it's about something very different, had nothing to do with this. I believe even Mr. -- I believe Mr. Gross was at that meeting. I mean, the meeting --

MR. GROSS: what meeting, now? I'm at the meeting, too?

MS. BARNES: No, I believe that the meeting that was reported in the Wall Street Journal was an informational meeting for lawyers, and I believe a number of counsel present in this case were reported as being at that meeting, had

Page 48

nothing to do with an industry meeting involving an insurance broker, the NRA, all of the major trade associations, had no idea of Ricker, had no knowledge of what he would say, and nothing in anything they brought forward that would lead me to believe that.

I just have a few other points of clarification.

I was having trouble remembering why it was that Mr. Bumann and Mr. Renzulli were subpoenaed the last time, and it was because they were listed in ASSC documents as members, and the context of remarking about Mr. Dorr and Ms. Kimball is that there were documents that were provided by subpoena from the NSSF and SAAMI, that listed counsel being present in, you know, either in a general assembly meeting or something else, and it was to that that I was referring, that they were present at established meeting s that had minutes taken, where notes were recorded and discovery was produced to me. I contrasted in that matter the instance wherein no sense had I ever seen a document that listed Ms. Kimball or Mr. Dorr as actual members of SAAMI in the context of that motion. Mr. Bumann and Mr. Renzulli were listed as members of a trade association. And so that was just one point.

THE COURT: But you were not aware of the specific trade association meetings that Mr. Ricker discusses in paragraph 16 attended by Mr. Bumann and Mr. Dorr?

MS. BARNES: I was unaware, and if you read Mr. -- I

## Page 49

1 believe it is in his affidavit, first of all, it is a series
2 of meetings that take place over approximately six years.
3 They are not meetings that notes were kept of. There are no
4 notes of those meetings, and there is no indication until
5 Mr. Ricker came forward from the depositions of any of the
6 parties in this case, or Mr. Feldman, that there was any
7 activity. I would specifically ask Your Honor to examine just
8 the end of Mr. Sanetti for Sturm Ruger's deposition, that was
9 taken in November of 1995.
10     THE COURT: This is in the old case?
11     MS. BARNES: In the old case, and this is questioning
12 not by me, Your Honor, but this is questioning at the end of
13 my deposition by Mr. Dorr of his own client, and I think on
14 that level it is extremely instructive. Mr. Dorr asks a
15 series of questions of Mr. Sanetti about joint activity.
16     "Question: What other involvement do manufacturers
17 of firearms have in the distribution of Sturm Ruger products?
18 They are competitors. They hope we don't distribute any.
19 They have no affects over what involvement to trade
20 associations that exist have in the distribution of Sturm
21 Ruger products. They can't and don't have any influence over
22 the distribution.
23     What involvement does the NRA or other consumer
24 organizations have in the distribution of Sturm Ruger
25 products?

## Page 50

1     As a consumer organization, they have no input into
2 our distribution. They are unilaterally set up by Sturm
3 Ruger. We hopefully get our products to legitimate research
4 purchases, but the NRA as a consumer group, they can't tell us
5 and don't tell us or try to tell us how to sell our products.
6     Is it correct to claim that manufacturers of handguns
7 and distributors of handguns and trade associations such as
8 SAAMI, NSSF or ASSC have specifically agreed and jointly acted
9 with respect to firearms distribution?
10     The answer is same answer, once again we do not and
11 cannot do that. That would be illegal.
12     Your Honor, we are presented here with Mr. Sanetti
13 saying one thing and Mr. Ricker putting in sharp contrast
14 these facts. Plaintiffs were stymied from beginning to end.
15 We would not have even known anything about these meetings,
16 because of the unilateral stonewalling and cover-up by this
17 industry, by all participants, and by apparently some of the
18 lawyers in this case, unless Mr. Ricker had stepped forward.
19     And by Mr. Dorr's own questioning, he raises the
20 issue that I would respectfully agree with Mr. Renzulli on, a
21 trial is to disclose all of this after all of these years, and
22 let us have a trial, but let us have a fair one, and let us
23 have one where it is not subject to mistrial or reversal, Your
24 Honor.
25     THE COURT: Anything else?

## Page 51

1     MR. GREENWALD: Your Honor, may I speak?
2     My name is Larry Greenwald, and I represent one of
3 the defendant manufacturers.
4     Because your decision had implications for people
5 beyond the people involved in this particular motion, the
6 arguments you heard have been on behalf of the individuals
7 involved. I wonder if I could say a brief word or two on
8 behalf of at least my client, and this is really in addition
9 to what has been said.
10     THE COURT: Sure. Go ahead.
11     MR. GREENWALD: I would like to identify the legal
12 frame work which Ms. Barnes has offered as the justification
13 for reopening discovery, I'm not going to get into any of the
14 elements relating to disqualification.
15     She offers in her papers two legal bases. The first
16 is the so-called enterprise liability. She says that's a
17 basis to elicit testimony from others about these meetings,
18 because they might have something relevant to say about
19 enterprise liability.
20     Well, what is being lost is that enterprise liability
21 simply does not apply here, and I invite the court's attention
22 not only to the cases, some of which are cited in the brief
23 filed on behalf of Mr. Dorr and Ms. Kimball, but specifically
24 to a case decided by Judge Weinstein in 1996, Hamilton v.
25 Accu-Tak, and I invite the court's attention to 935 Fed. Supp.

## Page 52

1 at 1327. And the basic elements or the critical elements of
2 the enterprise liability are, first, that all members, or
3 virtually all members, of the industry are called upon to
4 account for some wrongdoing. In the key case, which Judge
5 Weinstein in 1996 relied on, Hall v. Dupont, a case which
6 again Judge Weinstein decided in 1972, and that's at 345 Fed.
7 Supp. 353, the setting was that there were six manufacturers
8 of blasting caps, and a child was injured by a blasting cap
9 and was unable to -- there was a suit filed, and one --
10     THE COURT: Well, recall the case.
11     MR. GREENWALD: All right. But what evolved out of
12 that case was the standard for enterprise liability. In a
13 setting where there were six manufacturers, and where they
14 represented the entire blasting cap injury, and where the
15 manufacturer who produced the cap responsible for the harm
16 could not be identified, it was held that enterprise liability
17 would apply.
18     In writing his decision, Judge Weinstein specifically
19 pointed out it is one thing when you have a small group of
20 defendants or small group of manufacturers, but it's quite
21 another when you have a larger group, and enterprise liability
22 will not apply in those circumstances, and that concept has
23 been affirmed in any number of the cases.
24     So, here, the point to be made, Your Honor, is that
25 enterprise liability does not apply, and, therefore, that

**Page 53**

1 justification for reopening discovery, which is something
2 which has a serious impact on all manufacturers, certainly on
3 my client, that simply does not stand. The only other legal
4 justification which Ms. Barnes has offered for reopening
5 discovery is what she called joint enterprise or in her papers
6 she called it concerted action.
7      Now, in order to establish concerted action, you need
8 to show an express or tacit agreement to engage in a tortious
9 act. That test is set forth among other places in not
10 surprisingly a case written by Judge Weinstein, Hamilton v.
11 Accu-Tek, but this one at 62 Fed. Supp. 2d 802, at page 840.
12 That was decided in 1999. There has to be evidence of an
13 express or tacit agreement to engage in a tortious act.
14      Now, the question becomes, did anything Mr. Ricker
15 said in his affidavit even approach that? And, you know, we
16 haven't here today parsed out what Mr. Ricker has said, but in
17 paragraph 16 of the Ricker declaration, as I read it,
18 stripping away a view things which I don't think really go to
19 the heart of it, but the entire paragraph is cited on page 4
20 of the brief, filed on behalf of Mr. Dorr and Ms. Barnes, he
21 says three things, and let's examine each one of those, and
22 after listening to what he says, just ask yourself, so what?
23 What does it have to do with anything?
24      First thing he says, some of the most important
25 discussions of industry policy issues occurred at the shot

**Page 54**

1 show. Typically - I will skip some language - lawyers for the
2 firearm is industry would informally meet to discuss various
3 legal legislative and policy issues facing the industry.
4 That's one thing he says, and I say, well, so what? So in his
5 words, some lawyers got together to do what? To talk about
6 what? About legislative, legal, and policy issues facing the
7 industry.
8      Well, does that even knock on the door of the
9 standards reflected in Judge Weinstein's opinion that there be
10 an express or tacit agreement to engage in a tortious act?
11 What prey tell us a tortious act when industry lawyers get
12 together to talk about legislative, legal, and policy issues
13 facing the industry? There's just nothing there.
14      Let me turn to the second major thing that he says as
15 I read his declaration.
16      He says: These meetings often address questions such
17 as whether the industry should take voluntary action to better
18 control the distribution of guns. Richard Feldman and I
19 advocated a more proactive approach as a means of heading off
20 legislative action and reducing the risk of future liability.
21 Mr. Squire, Ms. Nichols, Mr. Dorr, Mr. Bumann and
22 others consistently opposed that idea.
23      Well, so what? So they had a discussion about an
24 issue that was important to the firearms industry, and
25 accepting what Mr. Ricker says as true, he says let's do it,

**Page 55**

1 others say we disagree, and what prey tell does that have to
2 do with the standard for concerted action liability, which is
3 an express or tacit agreement to engage in a tortious act? Is
4 it a tort for members of an industry discussing an issue to
5 have a disagreement, even a heated disagreement? Since when
6 does that rise to the level of something being actionable, and
7 how in the world does that justify reopening discovery at this
8 late date?
9      Let me get to the next thing, and I recognize the
10 plaintiff paints these things as being something nefarious,
11 some plot, some smoking gun, but if you look at the words that
12 Mr. Ricker spoke in his declaration, it is just not so.
13      The third thing, beginning in 1994, Mr. Dorr and Ms.
14 Nichols became concerned that industry counsel were openly
15 talking about such things. Jim Dorr told me he thought the
16 meetings were dangerous. Georgia Nichols told me that Jim
17 Dorr put out the word industry lawyers should not attend
18 future meetings. So what? Assuming it is true, so what?
19 Someone expressed an opinion these meetings are not a good
20 idea, meetings stopped. Well, where in the world does that
21 rise to the level of an express or tacit agreement to engage
22 in a tortious act?
23      What is the tort?
24      Assuming the opinion was expressed, assuming the
25 meeting stopped, what does that have to do with anything, and

**Page 56**

1 how does that come close to the plaintiffs meeting their very,
2 very high burden of fulfilling the requirements for this court
3 to grant truly extraordinary relief by reopening discovery?
4      Now, Ms. Barnes made a point earlier, which I need to
5 address. She says that there was conscious parallel activity
6 in connection with these meetings or as a result of these
7 meetings on the part of the industry. Well, you know, the New
8 York Court of Appeals has addressed that very question in
9 Hymowitz v. Eli Lily Company. The New York Court of Appeals
10 took on an earlier case in which parallel action played a
11 large role and was a foundation for the theory of concerted
12 action. But listen to what the New York Court of Appeals said
13 about that earlier case in Hymowitz. It is said: Now, given
14 the opportunity to assess the merits of this theory, this
15 theory being the parallel action, we decline to adopt it as
16 the law of this state.
17      Parallel behavior, the major justification for
18 visiting liability caused by the product of one manufacturer
19 upon the head of another, under this analysis, is a common
20 occurrence in industry, generally. We believe, therefore,
21 that inferring agreement from the fact of parallel activity
22 alone improperly expands the concept of concerted action
23 beyond irrational or fair limit. I'm looking, Your Honor, at
24 73 New York 2d, at page 508. So the New York Court of Appeals
25 has expressly rejected the concept offered by Ms. Barnes to

Page 57

1 you about parallel activity.

2     So, if you look, Your Honor, at what Mr. Ricker

3 actually said, as opposed to the unfounded unsupported

4 statements as to what people think he said, if you look at his

5 actual words and ask yourself, so what, the answer has to be,

6 I suggest, that his declaration does not come close to meeting

7 the standards of either enterprise liability or concerted

8 action, which are the only two legal justifications offered to

9 reopen discovery.

10     Now, reopening discovery, you know, doesn't just go

11 to a few depositions. Reopening discovery necessarily goes to

12 wherever those depositions lead, and really has the potential

13 to open the floodgates to all sorts of people to testify to

14 this. And if your starting point is -- and since Ms. Barnes'

15 starting point is Mr. Ricker's declaration, there is something

16 -- there is simply nothing which he actually said to justify

17 the extraordinary relief which is being questioned here.

18 Thank you, Your Honor.

19     THE COURT: All right. Thank you. Yes?

20     MR. HERFORT: Your Honor, I just have a couple of

21 things, if I may.

22     First of all, I would like you to look, if you would,

23 at the transcript that I left on your desk. We can give you

24 some additional items in there, and we'll send you a brief

25 letter today telling you the pages we would like you to look

Page 58

1 at that bear a little bit on what we are talking about.

2     THE COURT: So this is mine to keep?

3     MR. HERFORT: Could I look at it one minute? I don't

4 want to impose on you with a bunch of crazy handwriting.

5     Just a couple of other things.

6     Mr. Delfay's name came up. He was deposed in

7 Hamilton, Your Honor. He's not a new person.

8     Delfay -- excuse me, Your Honor. There's been some

9 discussion about Mr. Squire, who attended these meetings that

10 Mr. Ricker talks about. Ricker says he attended these

11 meetings from '92 through '97, and that's at line 17 of the

12 11th page of his affidavit.

13     Well, in fact, Ms. Barnes took Mr. Squire's

14 deposition in January 1998, and she said prior to his Powder

15 Horn experience, what was his prior job. And he said - this

16 is at page 17 of the deposition - he said, yes, I was

17 vice-president and general counsel of Colt. If you just give

18 me the dates. That was '89 or '90 up through 1991. So I

19 think we ought to get that fact straight.

20     In terms of the practicality of reopening discovery,

21 I suppose there's another point that we can't really ignore,

22 if we are going to start doing depositions, which I think is

23 anything to call for, we really have a problem of reopening

24 expert discovery and expert reports, because the expert

25 reports are based on, to a certain extent, depositions in this

Page 59

1 case, and you do have a problem of unraveling the ball with

2 the string in a way that I don't think is right for the

3 parties and right for the court.

4     THE COURT: Okay. Well, I have to say I don't have

5 an expert by expert knowledge of what they are all going to

6 testify to about a lot of what they have to say, has very

7 little to do with I think this particular fairly limited

8 issue.

9     MR. HERFORT: Actually, I think the expert report

10 that was put in this motion talks about joint activity, makes

11 allegations about joint activity. So if we are going to

12 reopen joint activity as an issue through the rather

13 attenuated angle of one paragraph in Ricker's Declaration, I

14 think you are going to get some reopening of the expert

15 situation.

16     MR. RENZULLI: Your Honor, if I may. I was at

17 Gregory Gundlach's deposition. Although I only had 12

18 minutes, I asked him if he was going to rely on this Ricker

19 affidavit, and his answer was "yes," although his report did

20 not show that. So I can get that testimony, if you want.

21     THE COURT: So you may already have the problem with

22 respect to Professor Gundlach anyway.

23     MR. RENZULLI: In terms of the Ricker affidavit, and

24 I think there are other experts that you have, funny things

25 happen after deposition getting to trial. I don't know who is

Page 60

1 going to rely on what, just for your consideration.

2     MR. HERFORT: One thing I would like to say before I

3 sit down, if I may, the disciplinary rule that Mr. Joseph and

4 I talked about, you know, the first sort of rule about the

5 lawyer possibly not being allowed to act, where it's obvious

6 that he ought to be called as a witness on an issue on behalf

7 of his own client, does have a very important proviso which is

8 the form at the end. It says: As to any matter of

9 disqualification as an advocate works a substantial hardship

10 for the client because of the distinctive value of counsel in

11 a particular case, you don't have disqualification.

12     THE COURT: Right. I think Mr. Joseph mentioned

13 that. I believe he spent time on that issue.

14     MR. HERFORT: Thank you, Your Honor.

15     THE COURT: Ms. Barnes, is there anything else you

16 want to say on this issue?

17     MS. BARNES: No, Your Honor.

18     MR. GROSS: David Gross, Your Honor.

19     Do you have the Feldman deposition? I'm not sure

20 which one you have.

21     THE COURT: I don't know if I have the Feldman one.

22     MR. GROSS: It was referred to.

23     THE COURT: I may have it in boxes somewhere packed

24 away, but I don't think I have it in hand. Mr. Feldman's

25 deposition, somebody mentioned it. Do I have it?

Page 61

1    MR. HERFORT: We gave you some of it, Your Honor, in
2    the sheaf of exhibits that we gave you. It is Exhibit H, not
3    the whole thing.
4    THE COURT: Okay. Is there something you want me to
5    look at, Mr. Gross?
6    MR. GROSS: The reason I asked you about it, Judge,
7    you seem to be concerned about what Ms. Barnes seemed to know
8    or didn't know some while ago that was of interest to the
9    court. It seems to me that Your Honor should have the
10    opportunity to see what was covered in this rather lengthy
11    deposition.
12    THE COURT: I'm happy to look at whatever I have. If
13    there's specific information pages that you think I should
14    have, Mr. Gross, I'm happy to take them from you.
15    MR. GROSS: Thank you, Judge.
16    THE COURT: All right.
17    We have the next issue.
18    MR. CONNELL: Yes, Your Honor. The next issue
19    pertains to incident reports.
20    We received defendant's opposition papers last
21    night. I believe the court did as well. Essentially what
22    plaintiff's motion deals with is about 108 boxes of incident
23    reports which are police reports and related documents
24    recovered in various municipalities around the country,
25    Boston, San Francisco, Los Angeles, both the city and county

Page 62

1    of Los Angeles, and I believe other municipalities whose
2    incident reports may or may not have been offered by
3    defendants.
4    The incident reports, as I stated, allegedly relate
5    to all incidents in which guns were recovered by law
6    enforcement agencies in those areas.
7    You know, it is plaintiff's understanding that
8    defendants had much of these incident reports as far back as
9    2001. Some of them relate to thefts of guns from retail
10    stores. Some of them relate to, you know, guns recovered in
11    relation to a homicide. They are clearly responsive to
12    various demands that plaintiff served, and defendants
13    repeatedly and throughout deny any knowledge of having
14    documents like this. So that to spring hundreds of thousands
15    of documents on us at the eve trial is somehow shocking and a
16    violation of the federal rules, and under Rule 37(c) they
17    should be excluded from use.
18    THE COURT: Well, let me just interrupt you for one
19    second because I think there are several pieces to this
20    issue.
21    MS. CONNELL: Sure.
22    THE COURT: I looked at Judge Weinstein's discussion
23    of this issue preliminarily on January 29th, and it is not
24    clear to me that the question of exclusion of these incident
25    reports is properly before me. I read his discussion of this

Page 63

1    issue as saying at least at that point in time go forward, get
2    the incident reports, do your own sampling, and then we'll see
3    where we stand down the line. I don't feel at this point,
4    having read this, that I have the authority to say the
5    incident reports are out of the case and we are not going to
6    move forward. So I think the issue is very -- you've gotten
7    the documents that you are entitled to get, and if not, what
8    can we do to expedite that process.
9    MS. CONNELL: Well, Your Honor, I have gotten -- we
10    did manage to find a place and got the boxes of the Boston
11    documents, which I think were about 28 boxes. I'm in the
12    process of getting the other boxes from Jones Day, was quite a
13    trial to find a place to put them and find somebody to take a
14    look at them. I have been informed by Jones Day now they want
15    us to pay for the copying of them, although they are going to
16    pay for redactions, they will do, and they would like us to
17    receive them I guess in rolling distribution, kind of deliver
18    them in bits and pieces for some of the defendants, but
19    something happened in the interim. My understanding of Judge
20    Weinstein's order or his direction at the hearing was that we
21    should go through the process.
22    So, two weeks after that hearing, based upon
23    defendants' representations at the hearing, I anticipated
24    getting the random samples that their experts were going to
25    use. As Mr. Fennell said, this is expert disclosure we didn't

Page 64

1    have to give you. This is earlier. What I received on
2    February 12th was one sample, which was just a list of the
3    incident reports that were relied upon by Mr. Wecker -- Dr.
4    Wecker, who is one of defendants' experts, but various other
5    experts from at least a dozen or more from counsel saying
6    here's a list of incident reports we may use at trial.
7    Now, other than certain exceptions like reports
8    relating to the BATF data, and reports by I guess Leahey &
9    Johnson relating to social sciences, because they received
10    exemptions from Your Honor, all expert reports were supposed
11    to be received by plaintiffs earlier this week. So the only
12    other expert report that I know that will relate to these
13    incident reports is an expert report filed by Colt's, and this
14    report is filed by a retired San Diego police officer who
15    reviewed the incident reports, somehow distilled the
16    information therein, and came to the conclusion -- this former
17    officer concludes that a substantial percentage of the
18    incidents reviewed, the Colt's firm was not viewed in a crime
19    or recovered in connection with the crime. I bring this up to
20    demonstrate to you the defendants will introduce them as fact,
21    not part of expert testimony, but somehow in the factual
22    presentation of their case, and I would like to provide a copy
23    of this report to you.
24    But in it you will see, you know, former Officer
25    Bridgeman qualifies as not recovered in relation to a crime,

**Page 65**

1 an instance where a homicide occurred, two suspects were
2 arrested, and 15 guns were recovered in connection with the
3 suspects, but there's no evidence that he found in his
4 investigation that the firearms recovered, which included a
5 Colt, were used in the homicide.
6       Now, I don't know if we are going to hear lots of
7 testimony like this at trial, which is clearly factual, and we
8 are going to have no time or way to rebut this. And I don't
9 think that this is the expert or the process that Judge
10 Weinstein envisioned. And I think because this is factual
11 information that should have been produced during discovery,
12 you know. Surely Dr. Wecker's testimony on this would be
13 subject to a motion to exclude before Judge Weinstein, which
14 will be heard right before trial, but this is a different
15 issue. And the other defendants who have designated, you
16 know, incident reports, and I understand that in almost all of
17 the cases it is incident reports that certain incidents that
18 relate to their client, that particular defendant only,
19 apparently it is not going to be used by an expert witness
20    unless it is included in Dr. Wecker's designation, then the
21 only apparent use is factual. And I would ask that those be
22 excluded under Rule 37(c).
23       MR. RICE:  Your Honor, Michael Rice for the
24 defendants.
25       Rule 37(c) is a somewhat different issue. Let me

**Page 66**

1 talk about what was disclosed to the plaintiffs on February
2 12th, and what Mr. Fennell had informed Judge Weinstein would
3 be disclosed.
4       The first disclosure was in fact the sample that Dr.
5 Wecker and Dr. Mathiowetz are going to rely on that was as
6 explained in the hearing, this, as you saw in the transcript
7 the focus of the principal use of the incident records from
8 Boston and California, and those were provided the list was
9 provided and copies included redacted copies of California
10 that sample was provided.
11       THE COURT:  So every document that was looked at in
12 taking the sample has been given to the plaintiffs and they
13 are relying on in that particular series of expert reports.
14       MR. RICE:  The sample was provided to the
15 plaintiffs. They made a random sample of the entire universe,
16 pulled the random sample, and that's what Judge Weinstein
17 asked us to give was give a list of the sample they are going
18 to rely on.
19       THE COURT:  How did they go about selecting the
20 sample?
21       MR. RICE:  There's an electronic list of the incident
22 numbers and they did a random sample of the number which were
23 then pulled out of the entire universe of the documents. Let
24 me back up.
25       Plaintiffs have now two days ago, I guess, picked up

**Page 67**

1 the Boston 28 boxes that have been sitting there waiting for
2 them since January 10th, and we are now going to be
3 forwarding, if they want, the entire California set, and we'll
4 redact them as required to by the producing parties, and
5 that's the only basis we are talking about going through
6 taking out names and addresses. We have offered to let them
7 do a sample of those documents, without having to produce the
8 entire set. We offered them the electronic list of the
9 incident reports, if Ms. Allen wants to use them as to
10 generate a sample, however they want to generate the sample.
11 We offered them to do that, pull those and redact them first
12 so that they could get them as quickly as they want. Again,
13 those documents have been available since January 15th, and
14 the request to actually get those occurred February 12th.
15       THE COURT:  When you say there's an electronic
16 list --
17       MR. RICE:  Sure.
18       THE COURT:  How is this list -- I mean, is it a
19 chronological list?  Is it a list by the name of the suspect?
20 Is it a list by the name of the gun?  I mean --
21       MR. RICE:  These are essentially law enforcement
22 incident records. Each one has an identifying number that the
23 underlying law enforcement agency gives it, and those are what
24 we call the incident numbers, and that incident number, just
25 the numbers that were produced or listed, are put on the

**Page 68**

1 electronic list. It's essentially taken off the incident
2 report, take the incident number, put it on the list, and so
3 there's a list of them. They did a random sample of those.
4 That's the sample pulled and provided to the plaintiff on
5 February 12th. We are happy to give them the entire sets, as
6 in Boston.
7       With California, I simply suggested if they were
8 going to do the sample, we can do that first and get them that
9 portion of the entire set as quickly as possible, because they
10 have to do the redacting process, and I wanted to move that
11 along as quickly as possible. But as I understand it, they
12 wanted all of it without starting there. So we'll start with
13 box one and do that.
14       THE COURT:  You just lost me now. I thought you had
15 already produced the ones that constitute the sample?
16       MR. RICE:  We have, I'm sorry, Your Honor. We had
17 produced all of the Wecker and Mathiowetz samples that the
18 defendants are using.
19       THE COURT:  Okay. So what are the two categories
20 that you just spoke of, if she wants to do her own sample?
21       MR. RICE:  If plaintiff's expert wants to draw a
22 sample, we'll get that sample to them first. I can't force
23 them to do that. I was trying to facilitate a way to get the
24 part they wanted to use as quickly as possible. If they want
25 the entire set, less than 80 boxes, we'll do that, and do it

## Page 69

1   on a rolling basis as quickly as we can.

2        THE COURT: What are the Boston documents used for?

3        MR. RICE: The same thing. Those we didn't have to

4   redact. We were able to give them the entire set as they

5   were. There wasn't this redaction issue.

6        THE COURT: Do the Boston documents -- was a sample

7   taken of the Boston documents and that's also included in the

8   Wecker report?

9        MR. RICE: Yes.

10       THE COURT: I see. Okay. And you have given her

11  these as well?

12       MR. RICE: Yes.

13       THE COURT: And what about the expert report that Ms.

14  Connell was just referring to, what is the police officer's

15  report -- I've forgotten his name.

16       MR. RICE: Bridgeman.

17       THE COURT: What is the use of the reports in Mr.

18  Bridgeman's report?

19       MR. RICE: Let me back up and go back to the hearing

20  before Judge Weinstein.

21       I want to make it clear that at the hearing before

22  Judge Weinstein, that Mr. Fennell took pains to come back and

23  point out to Judge Weinstein that it wasn't just Dr. Wecker

24  and Dr. Mathiowetz, that individual defendants may also use

25  some of these documents, and Judge Weinstein said get it to

## Page 70

1   them promptly. So the fact that individual defendants also

2   gave a smaller subset was not something that was a surprise or

3   was contemplated in front of Judge Weinstein.

4        Mr. Bridgeman in the transcript Mr. Fennell refers to

5   as a definitive expert, because we see him as an expert, as

6   someone who had particular knowledge of police reports, and

7   what is in them, and how you interpret them, and what they

8   mean. And so he will come in and, as his report was disclosed

9   in a timely manner, he will testify about what those incident

10  reports reflect vis-a-vis the tracing database house. It is

11  characterized in the tracing database versus what is reflected

12  in the incident reports, and other related material that is

13  again in the report about, you know, what you can gather from

14  reviewing the information.

15       I am not an expert on what Mr. Bridgeman is going to

16  testify about. He's obviously an expert designated that will

17  be deposed. Plaintiff will haven't an opportunity to question

18  him about what he has done and what the basis of his report

19  is.

20       THE COURT: The other defendants who have designated

21  documents, specifically reports, and provided them to Ms.

22  Barnes, are there experts who will be testifying about those

23  documents?

24       MR. RICE: I can't speak for how the other experts or

25  how the other defendants are all going to use that

## Page 71

1   information. And if they want to address that, they can.

2        Let me back up to the premise for Ms. Connell's

3   argument, which is that if an expert is not using it, it

4   should be excluded under Rule 37(c), because we can dispose of

5   that issue, and then we just get back to the same issue that

6   Judge Weinstein has already dealt with, which is delay and so

7   forth in the production of the documents.

8        37(c) presumes that these are documents that were the

9   defendants' documents that we somehow had an obligation to

10  produce. These were in fact documents produced by the

11  municipalities in California and by the municipality in Boston

12  during litigation, under protective orders quoted in my letter

13  response to the court that precluded the use of those

14  documents, precluded the use of those documents at any other

15  litigation, and requires the return or destruction of those

16  documents at the conclusion of that litigation. So these are

17  not in any sense the defendants' corporate documents that they

18  process.

19       The rule that the plaintiffs are pushing for would

20  have practical effects that don't make any sense. It would,

21  for instance, require that these defendants now produce the

22  national trace database, that had been produced to us in this

23  case, to the plaintiffs in California. Because that is "in

24  our possession" and under their reading is now a defendants'

25  document, that we should be producing in discovery out there.

## Page 72

1   Obviously that's not something we can do because we have a

2   protective order here.

3        THE COURT: Let me ask you a question. I understand

4   what you are saying, but you have had these documents - I

5   don't know that you necessarily have them, I'm using the use

6   of "you" as general you - you had these documents for a long

7   time. You had access to these documents in connection with

8   the other case. I would venture to say that you were aware of

9   the information in the case and its potential relevance to

10  this action, determined that you were going to use these

11  documents in this action, and waited until the eleventh hour

12  to issue the subpoena to get them again in this action, so as

13  to turn them over at the very last minute to plaintiff's

14  counsel. I think that's the argument.

15       MR. RICE: And they can make the argument. You know,

16  you can put me under oath. I can say that's not what

17  happened, that we didn't wait. It wasn't a calculating

18  strategy to wait until the last minute. We issued the

19  subpoenas in July and August of 2002, because we realized

20  discovery was coming to a close.

21       You have to remember, again, that we are looking at a

22  case that had been rolling along on motions until Judge

23  Weinstein suddenly converted it to a case that is going to go

24  to trial, and going to go to trial quickly. So the fact

25  discovery that everyone was doing everything not just related

Page 73

1 to these documents, but related to all fact discovery in this
2 case, suddenly was condensed and happened quickly. This is
3 one of the issues we put on the list in the subpoenas
4 themselves. They claimed surprise. They suggest that in
5 2003, January 15, 2003 was the first time that they found out
6 that we had these documents. The subpoenas themselves that we
7 served on them in July and August of 2002 indicated in the
8 subpoena that the documents we were seeking were documents
9 that were already in our possession, and that we were
10 subpoenaing them so that we could have access to them and use
11 them in this litigation. We weren't trying to hide them.
12 This was not hide the ball. This was we were subpoenaing the
13 records. We can't use them in this case. We want to use them
14 because as the case is developed, we think it will be
15 relevant. Those were the issues in fact argued and briefed
16 before Judge Weinstein, and appropriately Judge Weinstein said
17 let's go forward. I will not saying they are admissible or
18 ultimately let them in, but I will not shut the process off
19 now, and that's the process we are going through.
20        THE COURT: What troubles me is we have had open
21 discussion about the plaintiff's efforts to get from the ATF
22 documents which they subpoenaed and which they were having
23 problems getting, and on every single occasion, I believe at
24 which we held a hearing in this court, to try to expedite that
25 production, I invited those of you who wished to attend from

Page 74

1 defendants' sides, even though you yourselves had not
2 subpoenaed the documents.
3        What troubles me is that even though you may have
4 issued your subpoenas in June, we did not get these documents
5 in response to the subpoenas until some time after the close
6 of discovery in August, the end of August, and there's been a
7 lot of argument made to this court that discovery after the
8 end of the August should not be allowed for a variety of
9 reasons, which I will not repeat here. Yet I'm troubled by
10 the fact that during this entire period of time, from June to
11 whenever you finally got the documents, September or October,
12 nobody said to me, hey, Judge, you know, we subpoenaed these
13 months ago. We are having trouble getting these documents.
14 This is going to delay our ability to produce these documents,
15 to the plaintiff. That's what troubles me about this whole
16 incident.
17        Now, I understand Judge Weinstein hasn't made a final
18 ruling on this, and I'm not going to make a ruling on this one
19 way or the other. I just want you to know that I'm troubled
20 by the actions relating to these documents.
21        MR. RICE: And, Your Honor, I understand that, and,
22 you know, the court will think what it will. I will tell you
23 the honest answer to that is unlike the ATF subpoena, these
24 subpoenas were subpoenas issued by this court. So it wasn't
25 an issue that we felt - and I understand Your Honor suggests

Page 75

1 that we just should have raised it - but we couldn't come to
2 this court and say, Your Honor, will you force the City of
3 Boston to go ahead and get these documents to us? Will you
4 force the Los Angeles entities to get these documents to us?
5        THE COURT: No, but what I would have done, and what
6 I could have the authority to have done, is order you to
7 notify plaintiff's counsel every time you had a meeting with
8 the attorneys dealing with the Boston and California
9 documents, so that they could be involved in every step of the
10 way, just as I allowed you to be involved in every step of the
11 way in trying to obtain the ATF documents.
12        The whole point here is that we are all operating
13 under very tight strictures, time frame wise, and my job is to
14 try to make it fair for everybody, and I can't do that if you
15 don't let me know what is going on. Frankly, if asked my view
16 on this by Judge Weinstein, I will say that I don't think it
17 was fair the way you dealt with this issue in this particular
18 instance. But he hasn't asked me for my view, and until he
19 does, you know, I'm not going to volunteer it. But I just
20 want you to know that I'm troubled by that particular aspect
21 of this dispute.
22        That being said, my main question to you is, we need
23 these documents redacted and presented to plaintiff's counsel
24 as quickly as possible. When can we get them?
25        MR. RICE: I mean, we'll start redacting them right

Page 76

1 away. I told them last week that it would take at least a
2 week to do this many boxes and to redact them because the
3 names are in there a lot, but we are doing it on a rolling
4 basis so that they start getting them as quickly as we can.
5        MS. BARNES: When is quickly?
6        THE COURT: Tuesday. I want all of these documents
7 to her by Tuesday. You have a million firms involved. I am
8 sure you all have paralegals who can get together, have a nice
9 weekend, free pizza on the firm, and they can do a lot of
10 redactions. Tuesday for these documents.
11        MR. RENZULLI: Your Honor, I have to disagree with
12 the tone of the court here, and you don't know the whole story
13 once again. I had 13 defendants that were deposed in this
14 case. A question was asked to each defendant: Mr. Defendant,
15 if a gun is traced, does that mean the gun was involved in
16 crime? Answer: No.
17        What is your basis for that, sir? I have been sued
18 in the California municipal case and in the Boston cases. As
19 part of discovery in those cases, I received the police
20 reports which clearly stated that my gun was not involved a
21 crime. On the record, under oath, at a deposition. Okay.
22 And as you remember, Judge, all of these depositions were
23 occurring this summer, one after another, because you ordered
24 them to be that way, and we complied. I don't have 500
25 lawyers. The bottom line is that this was divulged to the

Case 1:99-cv-07037-JBW-CLP   Document 549   Filed 04/25/06   Page 20 of 21 PageID #: 1772

NAACP v. A.A. ARMS, et al                    Condenseit!                    February 21, 2003

Page 77

1  plaintiff. The mechanisms were put in place to dealing with
2  plaintiff's lawyers, who are suing us in other cases in order
3  to get their sensitive documents. That's what we did.
4       Ms. Barnes asked questions of my defendants. Well,
5  what are you talking about? What kind of police reports did
6  you get? And they told her what police reports they had
7  reviewed. I could not take those police reports and hand them
8  to the plaintiff. I was precluded in doing so because there
9  were protective orders in place in these other cases, one of
10 which is still being litigated. Why is there a sneak attack?
11 Every defendant that was deposed in this case that I represent
12 was asked that question and gave that response, if they were
13 in the Boston or California litigation. And I don't represent
14 to the court that they were all in that litigation, but many
15 of them were.
16      So, the limited purposes for which the individual
17 defendants are using these incident reports, that is, when
18 they are cross-examined at the time of trial, a traced gun is
19 a crime gun. I beg to differ. What is your basis? Police
20 reports. There's no sneak attack here, Judge. We are working
21 as fast as we can do get everything done.
22      THE COURT: Now, Ms. Barnes, we know how they are
23 going to use the trace reports without the expert. That's
24 been very helpful. Thank you, Mr. Renzulli.
25      MR. RENZULLI: That's all I'm using it for. I'm not

Page 78

1  here to do statistical models. Dr. Wecker is a statistician.
2  I don't understand half of what he does. As an advocate for
3  my clients, I'm using these particular incident reports for a
4  limited purpose for which I divulged to counsel on the record.
5       THE COURT: I mean, to the extent that your clients
6  answered the questions, I understand what you are saying. I
7  guess --
8       MR. RENZULLI: I don't like to be painted in a light
9  of, you know, we represent nefarious clients.
10      THE COURT: Mr. Renzulli, I never paint you in any
11 nefarious light.
12      MR. RENZULLI: The whole thing is, what burns me up
13 is I wanted to take a deposition of a company, okay, that did
14 a survey about retailers in the industry. Your Honor ruled,
15 and I didn't agree with it, and you know I didn't, that we
16 should wait for Ms. Allen's deposition. Critical information
17 that was asked of questions of retailers in this industry, and
18 I have to wait for Ms. Allen. Okay. So I went home. I
19 kicked the dog, I punched the wall. I said, this is justice?
20 Now I have, and this is not a laughing matter, I --
21      THE COURT: I hope you didn't kick the dog.
22      MR. RENZULLI: I don't have a dog. I have a problem
23 with being painted about, you know, you got paralegals. You
24 can take a weekend and get pizza. Listen, I don't think we
25 belong here, but the Judge disagrees, okay, so we are here,

Page 79

1  and I'm trying to be here under controlled conditions. But I
2  don't -- these things -- they get up and they say these things
3  like this is what these guys are doing. It's not true. I
4  will send you, and your law clerk will kill me, I will send
5  you the question and answer from every deposition of every
6  client that I represent that was asked that in their answers.
7  I want you to have that, and I don't want to be painted in a
8  negative light. I am offended by that. I'm offended by that.
9       MS. BARNES: will you also send, Mr. Renzulli, my
10 letter to your clients asking for those documents?
11      MR. RENZULLI: Who got you the 28 boxes of Boston
12 documents no charge, Ms. Barnes?
13      MS. BARNES: Will you also send the letters in?
14      MR. RENZULLI: I specifically asked for those
15 documents immediately after Mr. Jennuzzo's deposition, Your
16 Honor.
17      THE COURT: Tuesday.
18      MS. CONNELL: One more issue.
19      THE COURT: Yes.
20      MS. CONNELL: Your Honor, the fact that this is
21 maintained electronically is somewhat new. I asked
22 Mr. Fennell on the 12th or 13th, and if the incident reports
23 were kept in the electronic format, I ask that be produced.
24      MR. RICE: I offered them in a letter to be given them
25 an electronic list, not the records themselves. The records

Page 80

1  themselves are not, but the electronic listing I'm more than
2  happy.
3       THE COURT: That you used to prepare the sample?
4       MR. RICE: Yes.
5       THE COURT: Can you get that to them sooner than
6  later?
7       MR. RICE: Yes, I can do that today. That's no
8  problem.
9       MS. CONNELL: Thank you, Your Honor.
10      THE COURT: There were issues raised by some
11 defendants. Maybe I'm wrong. Maybe we are done.
12      MS. CONNELL: We had one motion by Mr. Renzulli, Your
13 Honor, on his application for another deposition of witness
14 Collins. Plaintiffs were supposed to put in papers today, but
15 Mr. Renzulli wanted to argue it. We would ask that we be
16 allowed today to put in papers, if the court feels it's
17 necessary.
18      THE COURT: That's fine. Since you are here, let me
19 hear from Mr. Renzulli, unless you have an objection to that.
20      MR. RENZULLI: Your Honor, I have been out of pocket
21 a little bit here, but I thought we filed a motion and
22 earmarked for the court exactly --
23      THE COURT: You did. Do you have anything to add?
24      MR. RENZULLI: No, nothing to add.
25      THE COURT: Okay. Then I don't need to hear from

Page 81

1  you.

2      MR. RENZULLI: I have nothing to add.  If there's
3  papers going to be presented, then obviously I would like --
4  give me 24 hours to send something to you by fax.

5      THE COURT: You will send it to me today?

6      MS. CONNELL: We'll endeavor to have it over to you
7  tonight, your Honor.  I apologize, the motion schedule has
8  been somewhat hectic, but, yes.

9      THE COURT: There was one particular issue in there
10 that relate to do a privileged question and I am assuming that
11 would definite willing be raised; am I right?

12     MR. RENZULLI: Yes, because we are moving, and I must
13 confess I haven't studied the papers.  If an expert is relying
14 on documents that he says are privileged and confidential, and
15 yet reaches a conclusion that based thereon, but will not
16 present them to the defense, it is impossible for us to defend
17 ourselves, and under those conditions we would move to strike
18 not only his testimony, which is the predicate or foundation
19 for that testimony, unless we are going to get the documents.

20     THE COURT: Right.  I understand.  I have to see what
21 they will say.  That was the issue raised at the deposition,
22 and at that point there was a need to confer with counsel in
23 the other cases, if that's where this information came from.
24 That's what I'm waiting to hear from Ms. Barnes on.

25     MS. BARNES: Thank you.

Page 82

1      MR. RENZULLI: I think I asked for identification of
2  the documents so that we can lay out a motion.  I didn't get
3  that, but maybe we will get that.

4      THE COURT: Let's see what we get, Mr. Renzulli.  You
5  can respond.  If we get them today, could I get your response
6  Monday?

7      MR. RENZULLI: Yes, by the end of business Monday.

8      THE COURT: I want to make sure we have enough time.

9      MS. BARNES: Thank you, Your Honor.

10     MR. RENZULLI: Thank you, your Honor.

11     (The proceedings are concluded.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25